**Robert N. COLWELL, Charles R. Ellinger and Richard H. Abrams, Jr., Plaintiffs–Appellees,**

v.

**SUFFOLK COUNTY POLICE DEPARTMENT, County of Suffolk, Defendants–Appellants.**

No. 1306, Docket 97–9019.

United States Court of Appeals, Second Circuit.

Argued March 19, 1998.

Decided Oct. 15, 1998.

Randy Berler, Assistant County Attorney, Suffolk County, Hauppauge, NY (Robert J. Cimino, Suffolk County Attorney, Theodore D. Sklar, Craig D. Pavlik, Assistant County Attorneys, on the brief) for Defendants–Appellants.

Brian J. Davis, East Meadow, NY (Daniel J. Baker, Neil H. Angel, Certilman Balin Adler & Hyman, LLP, on the brief) for Plaintiffs–Appellees.

B e f o r e: JACOBS, LEVAL, and GIBSON,\* Circuit Judges.

JACOBS, Circuit Judge:

Three Suffolk County police officers prevailed in a jury trial on their claim they were denied promotions as a result of discrimination in violation of the Americans With Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* (1994) ("ADA"). The United States

---

\* Honorable John R. Gibson, United States Court of Appeals for the Eighth Circuit, sitting by designation.

District Court for the Eastern District of New York (Block, *J.*), denied the defendants' motion for judgment as a matter of law, and the defendants appealed. We conclude the evidence at trial was insufficient to support the jury's finding that the officers were disabled within the meaning of the ADA, and therefore reverse and remand with instructions to enter judgment for the defendants.

## BACKGROUND

Lieutenant Robert N. Colwell, Sergeant Richard H. Abrams, and Sergeant Charles R. Ellinger are three veteran police officers with the Suffolk County Police Department ("SCPD"). As a result of injuries, each officer was assigned to do "light duty" for a substantial part of his career. Ordinarily, a light duty assignment means that the officer is unable to perform the regular duties of a police officer, but is nonetheless able to perform some police duties subject to specific restrictions depending upon the nature of the injury. *See* N.Y. Gen. Mun. Law § 207–c (McKinney 1982). For Colwell, Abrams, and Ellinger, these restrictions generally relieved them from duties involving "confrontation."

In February 1993 all three officers were bypassed for promotion to higher ranks within the SCPD. After filing a charge of employment discrimination with the Equal Employment Opportunity Commission ("EEOC") and receiving right to sue letters, the officers filed a complaint against the SCPD and the County of Suffolk (collectively "the County"), alleging that they were qualified for the positions for which they were denied promotions, and that they were denied those promotions because of their disabilities, in violation of the ADA.

### A. The Evidence at Trial.

At trial, the officers sought to prove that they had been on "light duty" status as a result of physical disabilities, that the Commissioner of the SCPD had instituted a policy to deny promotions to those on light duty assignment, and that as a result they had been denied promotions in rank they otherwise would have won. At trial, each officer presented evidence regarding his physical impairments, his qualifications for promotion

to higher rank, and the effect of the denial of that promotion. The following evidence concerning their physical impairments is recounted in the light most favorable to the officers.

### 1. Lieutenant Colwell

Lieutenant Colwell suffered a series of back injuries: one in 1979 pushing a disabled vehicle from a roadway; two others pulling people from cars; and yet another when he fell down some icy steps in 1984. According to Dr. Robert Reiss, a police surgeon at the County's Medical Evaluation Unit, Colwell suffers from "a chronic low back syndrome with left leg sciatica with increasing symptomatology."

Colwell testified to the following limitations: he cannot stand in one spot or in a "military type of formal ceremonial position" for any period of time without feeling "excruciating pain"; he has difficulty sleeping and relies on over-the-counter sleep aids or vicodin; he cannot lift "very heavy objects"; he cannot take a "two or three or four hour drive" without stopping to stretch his legs; he avoids doing mechanical work on his and his daughter's cars; although he does "basic chores," he is limited in his ability to do work in "any type of constructive areas"; he cannot "go shopping in the mall and stand around while [his wife] is trying on dresses"; and he cannot ski or golf or do "anything like that." In Colwell's case, light duty status meant "no confrontation, no heavy lifting, [and] no prolonged sitting or standing."

### 2. Sergeant Abrams

Sergeant Abrams suffered a series of lower back injuries: one in 1981; another while trying to arrest someone in 1983; and yet another when he slipped on ice getting out of a patrol car in 1991. According to Dr. Reiss, Abrams has a "chronic degenerative disk disease of his neck and lower back" and the range of motion in Abrams' lower back is "minimally depressed." As a result of these injuries, Abrams suffers headaches, backaches, neck pain, and pain radiating down his arms and legs.

Abrams testified generally that the injury "affects [his] entire life" and "[e]verything [he does] is in a limited capacity." As to specific limitations, Abrams testified that he cannot do mechanical work on automobiles (which used to be his hobby); he cannot "bend over for long periods"; he cannot do any heavy lifting or moving of furniture; he has "trouble" doing yard work, and if he tries raking, it "bothers" his back and neck; he cannot "continuously reach up," so that "painting or plastering" is painful; he has "some difficulty" driving, and if he drives for periods of time, he has to "stop and get out and walk around and stretch out a little bit"; he cannot stand "for a long period of time" or else he "start[s] to get a pain down in [his] lower back and shooting pain down into [his] leg"; and he cannot sit in one position too long, but has to "keep getting up and down and moving around." At work, Abrams cannot sit "for long periods of time" at his desk; he has to get up and "walk around to just stretch it out." Abrams would not be able to sit in a patrol car for twelve hours without being able to move around, "cannot get in and out of a [patrol] car excessively," and cannot do "excessive driving." Finally, in responding to an emergency, Abrams would have to walk, not run, to his patrol car. Abrams was assigned to light duty for a period of time after each injury, but after the 1991 injury he never returned to full duty status. While on light duty, Abrams was restricted from engaging in confrontation, doing any heavy lifting, excessive driving, and "excessive getting in and out of" an automobile.

Abrams' neurologist, Dr. Donald Holzer, explained that "Abrams [is] capable of performing some duties of his police work, but certainly not the majority of them." When asked how "such tasks as lifting or pushing or moving objects or digging or snow shovelling, that type of thing" would be affected, Holzer responded that:

There would be significant limitations. I mean he's not totally impaired to the point where he can do nothing, and, in fact, Mr. Abrams was working at the time I saw him, although in a light duty capacity. And that was my opinion at the time, and which has remained right through my see-

ing him up to the present time, has been that Mr. Abrams is capable of a light duty situation, but nothing further than that.

Asked what Abrams is "able to do in terms of work," Holzer opined:

Mr. Abrams certainly is not capable of any physical confrontation.... He is capable certainly of doing sedentary work, provided he has the ability to get up, change position. He can certainly infrequently reach over his shoulder, bend, twist, he can lift objects maybe ten to twenty pounds infrequently. He can stand and walk for short periods of time, maybe half an hour to an hour at a time. He is certainly capable of working an eight hour day with limitations.

### 3. Sergeant Ellinger

Sergeant Ellinger suffered a cerebral hemorrhage in 1984, after which he was hospitalized for approximately 30 days, and remained at home for an additional six months. On return to work in June 1985, Ellinger was assigned to light duty status, which meant that he was to "work days to avoid stress and confrontation and to avoid extreme elements such as cold and heat."

According to Ellinger, the only remaining symptom is that he sometimes experiences a sensation in his head that feels like the onset of another cerebral hemorrhage. That sensation occurs when he experiences stress or fear, or engages in physical exertion such as shoveling snow. Ellinger uses biofeedback techniques, easing the fear by "thinking good thoughts" or picturing "clouds [with] the sun coming through."

As to specific limitations, Ellinger refrains from doing physical work such as shoveling snow or heavy lifting, or else does it "very slowly"; does summertime digging or planting in his garden slowly; refrains from physical exercise in the wintertime; and wears hats.

In December 1992, Dr. Leonard Weitzman, a member of the Police Department's medical evaluation unit, determined that Ellinger was fit for full duty as a policeman. At trial, however, Ellinger presented a letter from his

doctor, Dr. Friedling, which recommended that Ellinger work the day shift, indoors only, with overtime only between eight a.m. and eight p.m., and that he avoid stress and confrontation. The doctor warns that "[a]t no time should this patient work late tours or rotating shifts." Suffolk County's Medical Review Unit concurred in this recommendation, and Ellinger elected to follow those restrictions, even after returning to full duty status.

## B. The Judgment.

The jury found that the County discriminated against the officers on the basis of their disabilities in denying their promotions. The jury also awarded each officer more than $200,000 in compensatory damages. The district court subsequently denied the County's Rule 50(a) motion for judgment as a matter of law (upon which the court had previously reserved decision), on the ground (*inter alia*) that there was sufficient evidence to support the jury's finding that each of the officers was disabled within the meaning of the ADA.

### Discussion

■ On appeal, the County argues, *inter alia*, that the officers failed to prove that they were disabled under the ADA, and that the district court therefore erred in denying judgment as a matter of law. In reviewing the denial of judgment as a matter of law, we view the evidence in the light most favorable to the nonmoving party, and will reverse "only if [we] can conclude that, with credibility assessments made against the moving party and all inferences drawn against the moving party, a reasonable juror would have been compelled to accept the view of the moving party." *Bradway v. Gonzales*, 26 F.3d 313, 317 (2d Cir.1994) (citations and quotation marks omitted).

We conclude that the evidence in this case is insufficient to permit a reasonable juror to find that the officers were disabled within the meaning of the ADA. The ADA defines a "disability" as either:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102 (1994). There is record evidence of some physical impairments, but it is insufficient to support a finding that those impairments substantially limited the officers in any major life activities. The evidence is also insufficient to establish that the officers had "a record" of substantially limiting impairments, or were "regarded as" having such impairments by the County. The district court therefore erred in denying the County's motion for judgment as a matter of law.

## A. Impairments that Substantially Limit Major Life Activities.

■ The Supreme Court recently followed a three-step process for determining whether a plaintiff has a disability under the first subsection of the ADA's definition. *See Bragdon v. Abbott*, —— U.S. ——, ——, 118 S.Ct. 2196, 2202, 141 L.Ed.2d 540 (1998). First, it determined whether the plaintiff suffered from a physical or mental impairment. *Id.* Second, it "identif[ied] the life activity" upon which the plaintiff relied and "determine[d] whether it constitutes a major life activity under the ADA." *Id.* Third, it inquired whether the plaintiff's impairment "substantially limited" a major life activity identified in step two. *Id.* In order to be eligible to prevail upon a further showing of discrimination, a plaintiff must satisfy each of the three prongs. Thus a plaintiff who showed that he had an impairment and that the impairment affected a major life activity would nonetheless be ineligible if the limitation of the major life activity was not substantial. Throughout, we are guided by "interpretations of parallel definitions in previous statutes and the views of various administrative agencies" that have considered these questions. *Id.* We also construe the ADA "to be consistent with regulations issued to implement the Rehabilitation Act." *Id.* at 2205.

### 1. Impairment.

■ Indisputably, the officers' conditions are "physical impairments" for the pur-

pose of the ADA. The EEOC has issued regulations implementing the ADA that define an "impairment" to include any "physiological disorder, or condition" that affects (*inter alia*) the neurological, musculoskeletal, and cardiovascular systems. 29 C.F.R. § 1630.2(h)(1). The evidence at trial showed that both Colwell and Abrams suffered from conditions affecting their musculoskeletal systems, and that Ellinger suffers from a condition affecting his cardiovascular system.

### 2. Major Life Activities.

The second step in the analysis is to identify the life activities affected by the impairment, and to determine whether those activities are "major" life activities under the ADA. *Bragdon,* 118 S.Ct. at 2202. The Supreme Court has explained that "[t]he plain meaning of the word 'major' denotes comparative importance and suggest[s] that the touchstone for determining an activity's inclusion under the statutory rubric is its significance." *Id.* at 2205 (citation and some internal quotation marks omitted); *see also Reeves v. Johnson Controls World Services, Inc.,* 140 F.3d 144, 151 (2d Cir.1998) ("The term 'major life activit[y],' by its ordinary and natural meaning, directs us to distinguish between life activities of greater and lesser significance.").

■ A regulation implementing the Rehabilitation Act interprets the term "major life activities" to include "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Bragdon,* 118 S.Ct. at 2205 (quoting 45 C.F.R. § 84.3(j)(2)(ii) (1997); 28 C.F.R. § 41.31(b)(2) (1997)); *see also* EEOC Regulations, 29 C.F.R. § 1630.2(h)(2)(i) (same). As the Supreme Court noted in *Bragdon,* this list is illustrative, and not exhaustive. *Bragdon,* 118 S.Ct. at 2205. We have identified other "major life activities," including, but not limited to, "sitting, standing, lifting, or reaching." *Ryan v. Grae & Rybicki,* 135 F.3d 867, 870 (2d Cir.1998) (quoting U.S. Equal Employment Opportunity Commission, Americans with Disabilities Act Handbook I–27 (1992)).

■ In deciding whether a particular activity is a "major life activity," we ask whether that activity is a significant one within the contemplation of the ADA, rather than whether that activity is important to a particular plaintiff:

> We do not think that such major life activities as seeing, hearing, or walking are major life activities only to the extent that they are shown to matter to a particular ADA plaintiff. Rather, they are treated by the EEOC regulations and by our precedents as major life activities *per se.*

*Reeves,* 140 F.3d at 151–52. The Supreme Court adopted this approach in *Bragdon* when it determined that reproduction is a major life activity without considering whether reproduction was an important part of the respondent's life. *See Bragdon,* 118 S.Ct. at 2204–05.

Finally, we have emphasized that "[t]he need to identify a major life activity that is affected by the plaintiff's impairment plays an important role in ensuring that only significant impairments will enjoy the protection of the ADA." *Reeves,* 140 F.3d at 152. This is because

> [a]n ADA plaintiff could considerably lessen the burden of making an individualized showing of a substantial limitation were he able to define the major life activity as narrowly as possible, with an eye toward conforming the definition to the particular facts of his own case.

*Id.*

The police officers in this case claim that their physical impairments have affected many specified life activities. Some of these may be "major life activities" under the ADA, and as to these we consider in the next section whether the limitations on these activities are substantial. But others are not major life activities in the first place. Although it is difficult and unwise to lay down principles for ascertaining in all cases which activities are significant and which are not, we can winnow out many of the impaired activities alleged in this case (such as golf and mall shopping) on the ground that they are insufficiently fundamental.

*Colwell.* The evidence at trial showed that Colwell's back condition affected his ability to stand, sit, lift objects, work, and sleep. We will assume without deciding that these are major life activities. *See, e.g., Ryan,* 135 F.3d at 870. Colwell also claims an impairment of his ability to sleep, which is undoubtedly a major life activity. However, Colwell also identified a number of activities that cannot reasonably be deemed major league, such as driving, doing mechanical work on cars, performing housework other than basic chores, going shopping in the mall with his wife, skiing, and golfing. *Compare* 45 C.F.R. § 84.3(j)(2)(ii) (1997) (listing examples of major life activities); 28 C.F.R. § 41.31(b)(2) (1997) (same).

*Abrams.* Like Colwell, Abrams testified that his condition affected his ability to stand, sit, lift objects, and work. Abrams is also limited in his capacity to bend over and reach up. We will assume that these are major life activities. Not so are other activities cited by Abrams: working on his cars, moving furniture, doing yard work, painting and plastering, and driving. Some of these activities incidentally may involve lifting, bending, and reaching, but they are not major life activities in themselves.

*Ellinger.* The evidence at trial showed that the only major life activity affected by Ellinger's cerebral hemorrhage was his ability to work. Ellinger also cited his diminished ability to dig and plant in his garden in the summertime, shovel snow from his driveway, and engage in other physical exercise in the wintertime. However, these activities clearly fall outside the range of "major" life activities.

### 3. Substantial Limitation.

The third step in the *Bragdon* analysis is to determine whether the plaintiff's impairment "substantially limits" the life activities that are properly deemed major. This inquiry is individualized and fact-specific. *Reeves,* 140 F.3d at 152; *Ryan,* 135 F.3d at 872; *see also Bragdon,* 118 S.Ct. at 2206 (evaluating evidence to determine whether the respondent's infection "substantially limited her ability to reproduce").

The Rehabilitation Act regulations provide no guidance. *See Bragdon,* 118 S.Ct. at 2205 (citing 45 C.F.R. pt. 84, App. A, p. 334 (1997)). However, the EEOC regulations implementing the ADA define the term "substantially limits" to mean:

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1). The regulations recommend that the following factors be considered in determining whether an individual is substantially limited in a major life activity: "(i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630(j)(2). *See also Ryan,* 135 F.3d at 871–72 (applying factors).

EEOC regulations also give guidance for determining whether an individual is substantially limited in the major life activity of "working." The ability to work is substantially limited (among other indicia) if the plaintiff is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i). The regulations make clear that "the inability to perform in a single, particular job does not constitute a substantial limitation in the major life activity of working." *Id.* Accordingly, we have indicated that, in analyzing whether a plaintiff is substantially limited in the ability to work, "the kinds of jobs from which the impaired individual is disqualified must be carefully considered." *Heilweil v. Mount Sinai Hosp.,* 32 F.3d 718, 723 (2d Cir.1994).

In the light of these considerations, we review the nature and severity of the impairments said to limit what we have held to be

major life activities of each plaintiff. We conclude that the evidence was insufficient to support the finding that any of the officers' impairments were substantial, particularly when evaluated in light of the first EEOC factor: "the nature and severity of the impairment" as compared with the average person's ability to perform those activities. *See* 29 C.F.R. § 1630.2(j)(2). Accordingly, we conclude that none of the officers has a "disability" under subsection A of the ADA's definition of the term.

■ *Colwell.* At trial, Colwell testified that his impairment limits his abilities to stand, sit, lift, sleep, and work. He had the burden to show that these limitations were substantial. *See Ryan,* 135 F.3d at 870. However, Colwell's descriptions of his limitations are marked throughout by hedging and a studied vagueness, so that there is no support for the idea that his impairments would be significantly limiting to "the average person in the general population," *see* 29 C.F.R. § 1630.2(j)(1), as opposed to someone expected to perform the prolonged, repetitive, and rigorous demands of a police officer. For example, Colwell has difficulty standing "at attention" for "any period of time" or standing "in one spot." This difficulty is overcome, however, if he is able "to move around a lot." Colwell cannot sit "too long," and "prolonged" sitting is a problem at work. As far as lifting is concerned, Colwell can lift "light objects," but not "very heavy objects." At work, Colwell's difficulty standing "in one particular area" for "more than an hour at a time" causes him difficulty when he lectures recruits (which is part of his job). In order avoid this problem, Colwell has to "move around. A lot of people think I've got some sort of weirdness because I'm constantly moving."

■ Similarly as to sleep, Colwell failed to show that his limitation should be deemed substantial. Essentially Colwell's evidence on this point was that he takes a medication as a sleep aid and that "I usually get a tough night's sleep." Difficulty sleeping is extremely widespread. Colwell made no showing that his affliction is any worse than is

suffered by a large portion of the nation's adult population. He failed to establish that the degree of limitation he suffers is substantial.[1]

■ *Abrams.* As with Colwell, Abrams' testimony as to his physical limitations is cast in terms of the demands of police work, and is carefully qualified. Abrams has difficulty standing "for a long period of time," or sitting "for too long." He cannot lift "anything heavy," bend over "for long periods," or reach up "continuously." At work, Abrams can't sit "for long periods of time" at his desk without getting up and stretching, and he cannot get in and out of a patrol car "excessively."

The testimony of Dr. Holzer is vague and qualified. Although Holzer testified that Abrams would not be capable of physical confrontation at work, Holzer stated that Abrams is capable of light duty and can perform sedentary work so long as he can "get up" and "change position." Holzer also testified that Abrams can infrequently reach "over his shoulder," bend, lift objects (of maybe ten to twenty pounds), and stand and walk for "maybe half an hour to an hour at a time." According to Holzer, Abrams is "capable of working an eight hour day with limitations."

Neither Abrams' testimony nor Holzer's supports the conclusion that Abrams is "substantially" impaired in his ability to stand, sit, lift, bend, or reach as compared with the average person. Nor do Abrams' limitations at work—including his inability to engage in physical confrontation—significantly restrict his "ability to perform either a class of jobs or a broad range of jobs . . . as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i). Abrams' impairment disqualifies him "from only a narrow range of jobs" (those involving physical confrontation) and thus his impairment is not "a substantially limiting one." *Heilweil,* 32 F.3d at 723.

■ *Ellinger.* Ellinger testified that his doctor imposed certain restrictions on his

1. We need not consider whether a plaintiff must show that the discrimination he suffered is moti-

vated in any way by the limitation of the particular major life activity.

work schedule, including that Ellinger work days only and only indoors, with overtime limited to the hours between eight a.m. and eight p.m. The doctor forbade Ellinger from working "late tours or rotating shifts," and instructed him to "avoid[ ] stress and confrontation." Ellinger testified that he continued to "follow" these restrictions after he was returned to full duty status.

This evidence is insufficient to show that Ellinger was "significantly restricted" in his ability to work at a class or broad range of jobs. His only evidence concerned the general restrictions imposed by his doctor. Without specific evidence about "the kinds of jobs from which [an] impaired individual is disqualified," the jury could not perform the careful analysis that is necessary to determine that Ellinger was substantially limited in his ability to work. *See Heilweil,* 32 F.3d at 723.

We conclude that each of the plaintiffs failed to advance evidence sufficient to show that the limitation he suffered with respect to a major life activity was substantial.[2]

**B. Records of Such Impairments.**

Even without a showing of substantial limitation of a major life activity, the ADA's definition of "disability" can be satisfied by "a record" of an impairment that substantially limits one or more major life activities. *See* 42 U.S.C. § 12102(2)(B) (1994). "The intent of this provision, in part, is to ensure that people are not discriminated against because of a history of disability." 29 C.F.R. pt. 1630 App., § 1630.2(k). According to the EEOC:

> This part of the definition is satisfied if a record relied on by an employer indicates that the individual has or has had a substantially limiting impairment. The impairment indicated in the record must be an impairment that would substantially limit one or more of the individual's major life activities.

*Id.* The record must be one that shows an impairment that satisfies the ADA; a record reflecting a plaintiff's classification as disabled for other purposes or under other standards is not enough. *See id.*

In reviewing the County's Rule 50 motion for judgment as a matter of law, the district court concluded (without explication) that Officer Ellinger could be considered to have such a record of impairment for the purposes of the ADA. On appeal, all three plaintiffs argue that their personnel records (which are part of the record in this case) show a history of a substantially limiting impairment.

The contention fails. With the exception of Ellinger's hospitalization, which is discussed below, the records of impairment that each plaintiff showed involved no greater degree of limitation of major life activities than the continuing impairments they showed. Their claims based on record of impairment therefore fail for the same reasons as their claims based on present impairment.

▪▪▪ In addition, Ellinger argues that his record reflects a substantially limiting impairment because he was hospitalized for 30 days following his cerebral hemorrhage in October 1984. Ellinger relies on *School Board of Nassau County v. Arline,* 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987), in which a schoolteacher's acute tuberculosis, "serious enough to require hospitalization" years earlier, was deemed a "record of impairment" so that she had the status of a "handicapped individual" within the meaning of the Rehabilitation Act. *Id.* at 281, 107 S.Ct. at 1127.

The fact of Ellinger's hospitalization does not establish a record of a *substantially limiting* impairment, even under *Arline.* As the Fifth Circuit recently observed, *Arline*

> cannot be construed to obviate the requirement, explicit in the ADA and its implementing regulations, that purported condi-

---

2. We note that the County did not defend on the ground that plaintiffs' impairments, even after reasonable accommodation, rendered them less well qualified for the promotions they sought than those who won the promotions. Plaintiffs, according to their own testimony, were unable to perform large parts of police work, and this could not be corrected by reasonable accommodation. Nothing in this opinion is intended to suggest that promotion of a non-impaired candidate on the basis of his or her better qualifications (giving the impaired candidate the full benefit of reasonable accommodation) can be considered "discrimination" under the statute.

tions be examined to ascertain whether a specific condition substantially limited a major life activity. *The ADA requires an individualized inquiry beyond the mere existence of a hospital stay.* Although the Court in *Arline* noted that the plaintiff's hospitalization established a *record* of impairment, the defendant had conceded that her acute tuberculosis had been substantially limiting.... [The contrary reading of *Arline* ] would work a presumption that any condition requiring temporary hospitalization is disabling—a presumption that runs counter to the very goal of the ADA. *Burch v. Coca–Cola Co.,* 119 F.3d 305, 317 (5th Cir.1997), *cert. denied,* — U.S. —, 118 S.Ct. 871, 139 L.Ed.2d 768 (1998) (emphasis added). Ellinger's hospitalization is certainly a *record* of an impairment, and the hemorrhage was certainly an impairment, but Ellinger was required to show that the impairment for which he was hospitalized was imposing a substantial limitation of one or more of his major life activities. This Ellinger failed to do. The only evidence of the extent of the impairment caused by Ellinger's hemorrhage was that Ellinger (1) was hospitalized for approximately 30 days, (2) remained at home for approximately six months after his hospitalization, (3) returned to work in June 1985, and (4) was placed on light duty with the above-mentioned restrictions until December 1992.

A jury could reasonably find that Ellinger was unable to work during his recuperation from the hemorrhage (one month in the hospital and six months at home), but a seven-month impairment of his ability to work, with the non-particularized and unspecific residual limitations described on his police work, is of too short a duration and too vague an extent to be "substantially limiting." *See Sanders v. Arneson Products,* 91 F.3d 1351, 1354 (9th Cir.1996) (holding that three and one-half month impairment with minimal residual effects was not substantially limiting), *cert. denied,* — U.S. —, 117 S.Ct. 1247, 137 L.Ed.2d 329 (1997); *Halperin v. Abacus Technology Corp.,* 128 F.3d 191, 200 (4th Cir.1997) (two month impairment not substantially limiting); *see also* 29 C.F.R. Pt. 1630 App., § 1630.2(j) (noting that "temporary, non-chronic impairments of short duration, with little or no long term permanent impact, are usually not disabilities").

■ Of course, every instance of hospitalization is disabling in the sense that one cannot go to work. But Ellinger attempts to rely on the open-ended light duty—which he concedes is not evidence of a continuing disability—to prolong indefinitely the disabling experience of a single acute episode of hospitalization. An employer that accedes to minor and potentially debatable accommodations (a sensible way to avoid litigation, liability, and confrontation), does not thereby stipulate to the employee's record of a chronic and endless disability. Otherwise, costless accommodations to physical complaints—here, the plaintiff's fellow officers, not the county, paid the price in terms of reduced flexibility in assignments—would entail large future costs, would discourage the employment of persons with minor limitations, and would promote litigation without assisting persons entitled to protection of the ADA.

### C. Being Regarded As Having Such Impairments.

■ The third way to prove a "disability" within the meaning of the ADA is to prove that the plaintiff is "regarded as" having an impairment that substantially limits one or more major life activities. 42 U.S.C. § 12102(2)(C) (1994). In *Francis v. City of Meriden,* 129 F.3d 281 (2d Cir.1997), we explained that whether an individual is "regarded as" having a disability "turns on the employer's perception of the employee" and is therefore "a question of intent, not whether the employee has a disability." *Id.* at 284. It is not enough, however, that the employer regarded that individual as somehow disabled; rather, the plaintiff must show that the employer regarded the individual as disabled *within the meaning of the ADA. See id.* at 285–86. Thus, in order to prevail, the plaintiffs were required to adduce evidence that the County regarded each officer as having an impairment that substantially limited a major life activity. This the officers failed to do.

■ As a threshold matter, the officers concede that their assignment to light duty status does not mean that they are regarded as disabled. Their argument is that they are regarded as disabled because (1) Colwell, Abrams, and Ellinger were on light duty on a long-term basis, and were continuously assigned to non-confrontational positions; (2) Abrams and Ellinger alone among the promotional candidates were required to undergo physical examinations; and (3) Police Commissioner Cosgrove considered Ellinger to be "light duty" despite his knowledge that Ellinger had recently returned to full duty status.

This evidence is insufficient to permit the inference that the County perceived the officers as having impairments that substantially limited them in one or more major life activities. Assignment to light duty status (as the officers concede) does not support the inference that the County viewed them as disabled; the fact that the light duty assignments were prolonged can make no difference. Continuous assignment of a policeman to non-confrontational positions does not permit the inference that the officers were regarded as *substantially limited* in their ability to do work. To prove that they were regarded as substantially limited in their ability to work, the officers bore the burden of proving that the County "perceived [them] to be incapable of working in a broad range of jobs" suitable for persons of their age, experience, and training. *Ryan v. Grae & Rybicki*, 135 F.3d at 872. The fact that the officers were believed to be unable to wrestle with disturbers of the peace is not enough. *See id.*

Evidence that Abrams and Ellinger were the only candidates for promotion required to submit to physical examinations provides no basis for concluding that they were regarded as limited substantially. For a long time, Abrams and Ellinger themselves had insisted that they had physical limitations that prevented their doing a full range of police work. The fact that the County perceived a need to require the exams suggests no more than that their physical condition was an open question.

Finally, the evidence that Commissioner Cosgrove thought of Ellinger as "light duty," even though he knew Ellinger had recently become full duty, supports no useful inferences because (as conceded) assignment to light duty status does not support the conclusion that an officer is regarded as disabled. It follows *a fortiori* that Cosgrove's continued conception of Ellinger as light duty does not support the conclusion that Cosgrove regarded Ellinger as disabled within the meaning of the ADA.

### Conclusion

We conclude that there was insufficient evidence to support the jury's finding that the officers were disabled within the meaning of the ADA. We have considered all of the officers' arguments to the contrary and find them to be meritless. The judgment of the district court is therefore reversed, and the case is remanded with instructions to enter judgment for the defendants.