Teresa ROSA, Plaintiff,

v.

BRINK'S INC., Murray Rouse, Louis Biron, and Joseph Eyal, Defendants.

No. 99 CIV. 4673(JSR).

United States District Court, S.D. New York.

July 5, 2000.

John Paul Fulco, Salon Marrow & Dyckman, New York, NY, for plaintiff.

James E. Kellett, King, Pagano & Harrison, New York, NY, for defendant.

## MEMORANDUM ORDER

RAKOFF, District Judge.

Move over, Archie Bunker. According to the plaintiff here, defendant Brink's Inc. and three of its executives are so steeped in prejudice that they intentionally discriminated against her on grounds of race, national origin, gender, age, and disability—all at once. The only problem is that even after extensive discovery plaintiff cannot support any of these allegations with sufficient evidence to avoid summary judgment.

The pertinent facts, either undisputed or, where disputed, taken most favorably to plaintiff, are as follows:

Plaintiff Teresa Rosa was born in Brazil in 1955. In her Complaint, she states that she is "a Hispanic Latin female of Brazilian origin." Cmplt. ¶ 11. In her statement of facts submitted pursuant to Local Rule 56.1, she states that she "is mixed race; her mother is black. [Her] mother's father is black and her father is Caucasian Brazilian." *See* Pl. 56.1 Stmt. ¶ 5.

Plaintiff was hired by Brink's in August, 1994 as an Administrative Assistant in Brink's Diamond and Jewelry division, reporting to Barry Berman, the General Manager of that division. *See* Pl. 56.1 Stmt. ¶¶ 6, 30. About two months later, she was given the title of Office Manager. *See* Def. 56.1 Stmt. ¶ 16; Pl. 56.1 Stmt. ¶ 31. Her duties included secretarial tasks, managing the switchboard, preparing presentations for Berman, processing new employees, and coordinating the purchase and lease of office supplies and equipment. *See* Pl. 56.1 Stmt. ¶ 34; Def. 56.1 Stmt. ¶ 23.

Over time, plaintiff also assumed increased Human Resources duties, and in June 1997, her title was changed to "Office/HR Manager." *See* Def. 56.1 Stmt. ¶¶ 26–30; Pl. 56.1 Stmt. ¶¶ 32–38. While this change did not entail a raise, it was accompanied by a decrease in her secretarial functions, and, in August 1997, Berman hired a separate employee, Teresita Belen, to serve as his secretary. *See* Def. 56.1 Stmt. ¶ 35; Pl. 56.1 Stmt. ¶¶ 25, 32.

Beginning in early 1998, Brink's began consolidating its Diamond and Jewelry division with another unit, the Air Courier division. *See* Pl. 56.1 Stmt. ¶ 98; Def. 56.1 Stmt. ¶ 59. While this was in progress, plaintiff, on April 27, 1998, tripped over a

cabinet door at work and injured her lower back. *See* Pl. 56.1 Stmt. ¶ 96. She took an immediate leave of absence that ultimately extended more than six months, to November, 1998. *See* Def. 56.1 Stmt. 52; Pl. 56.1 Stmt. ¶ 96.

During the time plaintiff was on leave, the consolidation continued, under the direction of defendant Joseph Eyal, a Vice–President and Managing Director of Brink's, and defendant Louis Biron, who was made the manager of the newly combined division. *See* Pl. 56.1 Stmt. ¶ 98–101. Among other things, the efficiencies incident to the consolidation resulted in the termination of plaintiff's immediate boss, Berman, most of whose duties were reassigned to defendant Murray Rouse. *See* Pl. 56.1 Stmt. ¶ 99; Def. 56.1 Stmt. ¶ 92. Contemporaneous with this move, most of plaintiff's Human Resources functions were assumed by Biron, while one Amanda Wright assumed plaintiff's clerical functions. *See* Def. 56.1 Stmt. ¶¶ 93; 107–08. Both Biron and Wright previously worked in the Air Courier division. *See id.* at 54; 107.

Plaintiff—still on leave and only very occasionally in contact with Brink's during this period—was not informed of these changes at the time. However, on November 12, 1998, she left a voicemail message for Biron letting him know that she was ready to return to work. *See* Pl. 56.1 Stmt. ¶ 118. In response, Biron wrote to plaintiff that same day (November 12) advising her that he had received her request to return but that her position had been abolished and that she should consider her employment terminated as of November 16, 1998. *See* Fulco Aff, Ex. 28; Pl. 56.1 Stmt. ¶ 121. Biron's letter did invite plaintiff to inquire about any open position for which she was qualified; but when, on November 16, 1998, plaintiff called Biron to ask about possible openings, *see* Pl.Ex.

29, Biron responded that he himself had no vacancies but that he would check with Rouse. *See id.* Thereafter, Rouse responded that there was nothing suitable for plaintiff at that time. *See* Rouse Decl. ¶ 5; Pl. 56.1 Stmt. ¶ 136.

Plaintiff then filed a charge, on March 3, 1999, with the United States Equal Employment Opportunity Commission, alleging that she had been wrongfully terminated and otherwise discriminated against because of her race, national origin, sex, age and disability. Subsequently, on June 28, 1999, she filed the instant Complaint, alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), 42 U.S.C. § 1981 ("section 1981"), the Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.* (the "ADA"), the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* (the "ADEA"), the New York State Human Rights Law, Executive Law § 290, *et seq.*, and the Administrative Code of the City of New York § 8–101, *et seq.*

In addition to alleging that plaintiff had been terminated in violation of each of these laws, the Complaint also vaguely hinted that plaintiff was alleging still other causes of action premised on other alleged acts taken by Brink's. However, in her briefing on the instant motion, plaintiff has made clear that the only claims that she is still pursuing beyond wrongful termination are claims that Brink's discriminatorily reduced her job responsibilities, denied her a particular raise, and failed to give her a particular promotion. *See* Pl. Mem. at 2.[1]

Against this background, the Court, after a careful review of the parties' submissions taken most favorably to plaintiff, concludes that the only one of plaintiff's claims that is even arguably colorable is her claim that she was terminated on the basis of disability. But even this claim is legally deficient, on several grounds.

---

1. Conversely, plaintiff has expressly abandoned the "hostile environment" claim seemingly alluded to in her Complaint, *see* Pl. Mem. at 1 n. 1, and has also abandoned by her silence any "retaliation" claim that might be argued to be obliquely referenced in one word of paragraph 32 of the Complaint.

To begin with, plaintiff no longer contests that the consolidation of the Air Courier division with the Diamond and Jewelry division was an independent business decision that led, *inter alia* to the termination of various employees including her own immediate boss, or that as part of that consolidation her duties were assumed (at least temporarily) by persons brought over from the Air Courier division. She argues, nonetheless, that the defendants' failure to inform her of her termination until she requested the opportunity to return following her medical leave supports a finding of intent to discriminate on the ground of disability.

■ This argument fails, however, because plaintiff offers nothing to show that Biron, who fired her, believed she would still be suffering from any disability when she returned to work. On the contrary, she made no mention of it in her voicemail message of November 12, 1998, to which he responded, that very day, with his letter informing her that her prior job had been abolished. *See* Pl. 56.1 Stmt. ¶ 118; Fulco Aff. Ex. 28. Rather, plaintiff's alleged continuing disability was first mentioned only in a follow-up letter that plaintiff insists she sent to Biron on November 13, 1998, in which plaintiff requested various accommodations on her return to work. But even plaintiff, whose testimony is the sole support for the existence of this letter, does not contend that the November 13 letter was mailed to Biron, let alone received by him, until after he had already sent plaintiff the November 12 letter informing her of her termination. *See* Pl. 56.1 Stmt. ¶ 120; Fulco Aff., Ex. 28.

Moreover, even assuming, *arguendo,* that plaintiff could somehow make a showing, sufficient to survive summary judgment, that Brink's termination of her was materially motivated by anti-disability animus, her disability claim must still fall because she simply does not qualify for coverage under the ADA. That statute defines a disability as: "(A) a physical or mental impairment that substantially lim-

its one or more of the major life activities of [an] individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102 (1994). Applying this standard, the Court of Appeals has determined that an impairment of the kind here suffered by plaintiff does not constitute a "disability" under the ADA. *See Colwell v. Suffolk County Police Department,* 158 F.3d 635, 642–44 (2d Cir.1998).

The Court in *Colwell* first considered whether the impairments there suffered by three police officers—two of whom had suffered back injuries considerably more severe and debilitating than those suffered by the plaintiff here—substantially limited the officers' major life activities. The Court found that certain affected activities, "such as driving, doing mechanical work on cars, performing housework other than basic chores, shopping ... skiing and golfing," were "insufficiently fundamental" to constitute major life activities in terms of the ADA. *Id.* at 642–43. Further, as to those affected activities that were major life activities, such as standing, sitting, and lifting, the Court of Appeals found that the officers' back injuries had not led to impairments of such activities that had the kind of significant restriction or severe, long-term impact that would qualify as a "substantial limitation" under the pertinent law and regulations. *Id.* at 643, *citing* 29 C.F.R. § 1630.2(j).

■ Here, plaintiff claims that since the time of her seeking to return to work in November, 1998, she has not been able to clean her house "properly," walk or sit or stand for long periods without some undefined pain, or engage in sports such as biking, scuba diving, camping, hiking, and riding horses. *See* Rosa Dep. at 467–472. Under *Colwell,* however, the sports activities are not major life activities at all; and the impairments she alleges of the other activities are no worse than those found in *Colwell* to be insufficiently substantial to qualify for ADA coverage.

Indeed, it is undisputed that plaintiff is able to commute by train three hours per day to and from her current job and perform her duties there with modest accommodation. *See id.* at 331, 469–71. Conversely, plaintiff has failed to adduce particularized evidence of significant limitations she endures with respect to any major life activity. Indeed, in response to defense counsel's repeated requests for such specifics, plaintiff was adamantly vague and conclusory, *see id.* at 467–72, precisely the deficiency that the Court of Appeals found fatal in *Colwell, see* 158 F.3d at 643–44.

Further still, plaintiff has failed to show in what material respects she suffers limitations beyond those found in much of the average population. Recurrent back pains and problems are endemic to a substantial part of the adult population of the United States, and it would require something considerably more severe and specific than anything plaintiff has evidenced here for such a problem to qualify as "substantial" in terms of the ADA. *See Colwell* at 643–44.

As to the other prongs of § 12102, plaintiff has utterly failed to adduce competent evidence that Brink's had a "record" of her being disabled in terms of the ADA or regarded her as being disabled in those terms. As stated in *Colwell,* "It is not enough ... that the employer regard that individual as somehow disabled; rather, the plaintiff must show that the employer regarded the individual as disabled within the meaning of the ADA." *Id.* at 646. In other words, Brink's must have believed that plaintiff suffered from a disability that substantially limited a major life activity. Given that plaintiff herself has failed to adduce competent evidence of such an impairment, it is hardly surprising that she has failed to come forward with competent evidence that Brink's believed, or had a record of, her suffering from that kind of impairment.

■ Turning to plaintiff's other claims, plaintiff alleges that certain further incidents beyond those previously canvassed support her claims that her termination, even if not unlawfully motivated by her alleged disability, was motivated by considerations of race, national origin, gender and/or age. Certain of these incidents, she further alleges, also support her independent claims of discriminatory refusal to promote, discriminatory reduction in responsibilities, and discriminatory denial of raise. Inspection of the relevant admissible evidence, however, reveals that none of these incidents, whether viewed alone or together, remotely supports any of these claims:

(1) Plaintiff alleges that she was paid a lower salary than any other person at "management level," and, in particular, was paid at a level lower than whites and males with less responsibility. Cmplt. ¶ 13. However, her reference to the broad and vague category of "management level" is not further defined, and she fails to adduce meaningful data to support any of these allegations. Instead, plaintiff now admits that she does not know of anyone at Brink's who was doing work similar to hers. *See* Kellett Decl., Ex. A, at 446.

(2) Plaintiff alleges that in 1996 and 1997, Rouse, after telling her she was a "powerful woman," Cmplt. ¶ 15—a statement from which she somehow infers bias—assigned to others several of plaintiff's responsibilities, including switchboard oversight, supply management, new hire training, and responsibility for the "extra mile award program." *See* Pl. 56.1 Stmt. ¶ 51; Rosa Dep. at 342–345 (Fulco Aff., Ex 155). Far from showing how such changes were motivated by bias, however, she does not contest defendants' proof that these responsibilities were mostly transferred to other women of various minority backgrounds, most of whom were older than plaintiff. *See* Def. Mem. at 8; transcript of oral argument, 3/23/00 ("tr.") at 49, 73–74.

(3) Plaintiff alleges that in 1998, after Berman recommended a 9.22 percent raise

based on her 1997 performance, Biron vetoed her raise, *See* Pl. 56.1 Stmt. ¶¶ 66–87. But in addition to plaintiff's failure to prove this was discriminatory, it is premised on an inaccurate assumption, as defendants' undisputed proof on this point demonstrates that Biron, who only transferred over from the Air Courier division in early 1998, was merely in the process of evaluating plaintiff's raise when she went on leave in April, 1998, thus placing the matter on hold. *See* Def. 56.1 Stmt. 164–65.

■ (4) Plaintiff alleges that, even though, when working for Berman, she received reimbursement for her commuting expenses, such reimbursements stopped after the consolidation early in 1998 and Brink's then began deducting past such reimbursements from her paycheck. *See* Pl. 56.1 Stmt. ¶ 88. However, while plaintiff alleges this was discriminatory because certain "expatriates" who come to work in Brink's New York office are reimbursed for certain attendant expenses such as school tuition, *see id.* at 93, she now concedes that she knows of no one else in Brink's who received reimbursement for commuting expenses. *See* Rosa Dep. at 296.

■ (5) Plaintiff's remaining allegations reveal, by their utter lack of probative value, the poverty of her case. For example, plaintiff seeks to draw support for her claim of gender prejudice by referencing the portion of her deposition where she quotes Eyal as responding to her request to be transferred to Brink's Miami office by saying that "Miami is a man's office." *See* Fulco Aff., Ex. 154 at 154. She neglects to mention, however, that later in the same deposition she corrected the record by testifying that Eyal had simply said it was a "one-man office," *id.*, Ex. 155, at 385. Similarly, plaintiff seeks to support her claim of bias on the basis of national origin by alleging that Biron on one occasion reprimanded her for spelling his name incorrectly and on another occasion asked her to correct certain typographical errors. *See* Pl. 56.1 Stmt. ¶ 44. At oral argument, however, her counsel conceded that plaintiff had in fact made such errors on both occasions and that there was no evidence in the record that Biron failed to similarly reprimand other employees for similar mistakes. *See* tr. at 57–62.[2]

Furthermore, few if any of plaintiff's remaining allegations are supported by competent evidence, and none, in any case, causally relates to her claims. For example, plaintiff makes a number of vague and conclusory allegations about the ways in which "expatriates" were treated differently from other employees, without, however, offering non-hearsay admissible evidence to support these allegations. She also alleges that Brink's failed to comply with its Affirmative Action plan, but does not claim that Brink's failed to apply the policy appropriately with respect to her.

Thus, as the foregoing recitation makes clear, neither the facts of her termination nor these additional allegations, even when taken together and most favorably to plaintiff, reasonably support an inference that plaintiff's termination was motivated by discrimination on the basis of race, national origin, gender or age, nor support any independent claim of discriminatory failure to promote, reduction of work responsibilities, or denial of raise.[3]

**2.** While plaintiff also alleges that Rouse once "joked" about her English, she cannot remember what Rouse said or who was present at the time, *see* Pl. 56.1 Stmt. ¶ 44; tr. at 50–57, and she does not allege that Rouse made such a joke more than once. *See* tr. at 52.

**3.** Further still, the latter claims, to the extent they are brought under Title VII or the ADEA, are independently barred by the applicable 300 day statute of limitations, since plaintiff filed her EEOC claim on March 3, 1999 and therefore is barred from bringing Title VII and ADEA claims arising before May 7, 1998. *See* 42 U.S.C. § 2000e–5(e); 42 U.S.C. § 12117(a); 29 U.S.C. § 626(d)(2). Plaintiff attempts to escape this result by resort to the "continuing violation" exception, *see e.g., Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 907 (2d Cir.1997); but in support of the "relatedness" that would permit invocation of

In short, plaintiff's entire case here is a tissue of suggestion, advanced with fervor but unsupported by even the very modest evidence necessary to survive summary judgment. Summary judgment must therefore be granted dismissing all of plaintiff's claims. Clerk to enter judgment.

SO ORDERED.

that exception, she hypothesizes a convoluted theory that Brink's favors young white Israeli males over all others—while utterly failing to adduce evidence of any instance in which she was discriminated against in favor of any Israeli employee.