David TROBIA, Plaintiff,

v.

William J. HENDERSON, Postmaster, United States Postal Service, Defendant.

No. 01–CV–6414L.

United States District Court, W.D. New York.

April 26, 2004.

Christina A. Agola, Rochester, NY, for Plaintiff.

Brian M. McCarthy, U.S. Attorney's Office, Rochester, NY, for Defendant.

## DECISION AND ORDER

LARIMER, District Judge.

### INTRODUCTION

Plaintiff, David Trobia ("plaintiff" or "Trobia"), a long-time employee of the United States Postal Service ("USPS") brings this action under § 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("the Act"), claiming that the USPS discriminated against him on account of a medical disability and retaliated against him for complaining about such treatment. The case was bifurcated and tried to the Court for a week, from November 3 to November 10, 2003, solely on issues of liability. The Court heard approximately eighteen witnesses, received numerous documents and several videos bearing on issues in the case. The parties also submitted post-trial memoranda. This decision constitutes my Findings of Fact and Conclusions of Law. Fed.R.Civ.P. 52(a).

### FACTUAL BACKGROUND AND PLAINTIFF'S CLAIMS

Plaintiff has been employed by the USPS in various capacities since 1974, and as a clerk since 1983. Plaintiff has had a lengthy list of medical problems over the years which necessitated extensive absences from his employment with the USPS. In 1988, because of a non-work related injury, Trobia had a laminectomy. In 1991, he had another surgery to correct a disc protrusion and was unable to work for several months until he returned in June 1991. Thereafter, Trobia continued to have problems and was restricted to light duty at the USPS from 1991 through May 13, 1992, when he suffered a reoccurrence of his back problems. Eventually, on August 25, 1993, Trobia had surgery which involved a posterior lateral spine

fusion. Trobia did not return to work from that procedure for almost a year, until July 25, 1994, when he returned part-time. He did not return to full-time employment until September 1994. This medical history is not disputed and plaintiff makes no claims concerning disability discrimination for any of these matters.

From July 1994 to January 12, 1996, Trobia worked at the Jefferson Road Distribution Center in Rochester, New York as a clerk in what the parties refer to as the Box Section. This job was a limited duty position that was created by the USPS to fit within his post-surgical medical restrictions. It is clear, and I so find, that Trobia worked without complaint in that limited duty position, and he was happy there. Trobia's removal from that position is the precipitating event that is at the heart of this lawsuit.

In the Fall of 1995, the USPS had begun discussions with union representatives and management about creating several limited duty positions on each shift to assist disabled employees. During these meetings, Trobia's name was mentioned and the USPS determined generally that Trobia would be moved to a new position out of the Box Section sometime in the near future.

On January 12, 1996, however, Trobia was abruptly removed from the Box Section because he had an altercation with other Box Section employees. This was not the first incident involving disagreements between the Box Section employees and Trobia. Several employees had complained in the past to Trobia's supervisors about conflicts they had with Trobia and about his attitude on the job. The altercation on January 12 brought the matter to a head and Trobia was removed from the Box Section at that time. Trobia's removal came sooner than the USPS had originally anticipated and it was placed in the position of finding a new limited duty position for plaintiff at that time.

Plaintiff repeatedly asked that the USPS to return him to his position in the Box Section. The USPS denied those requests. Trobia claims that the USPS's failure to return him to the Box Section constituted a failure to "accommodate" his disability and, therefore, in Trobia's view, violated the Act. Further, Trobia claims that the USPS violated the Act by transferring him to a new job where he worked on a "handicapped case" pitching mail because it did not fit within his medical restrictions. Plaintiff worked in this position from January 1996 until June 1997. Plaintiff alleges that when he informed the USPS that the new position exacerbated his back condition and provided supporting medical proof, the USPS failed to provide him reasonable accommodation and retaliated against him by refusing to offer him a new position for more than a year.

Plaintiff seeks relief against the USPS under the Act based on the failure to accommodate and for retaliation. As such, plaintiff has the burden to show that: (1) his employer is subject to the Act; (2) he was "disabled" within the meaning of the Act; (3) he was qualified to perform essential functions of the job, with or without a reasonable accommodation; and (4) his employer had notice of the plaintiff's disability and failed to provide a reasonable accommodation. *Stone v. City of Mt. Vernon*, 118 F.3d 92, 96–97 (2d Cir.1997); *Bonner v. New York State Elec. & Gas Corp.*, 195 F.Supp.2d 429, 434 (W.D.N.Y. 2002). In order to establish a claim of retaliation, Trobia must show that: (1) he engaged in an activity protected by the Act; (2) the USPS was aware of this activity; (3) the USPS took adverse employment action against him; and (4) a causal connection exists between the alleged adverse action and the protected activity.

*See Cifra v. G.E. Co.,* 252 F.3d 205, 216 (2d Cir.2001).

There is no question in this case that the USPS is subject to the Act. There are, however, legitimate issues as to the other elements of plaintiff's claims. The trial focused principally on issues concerning whether the USPS adequately "accommodated" Trobia consistent with the Act and governing regulations, and whether the USPS retaliated against plaintiff for requesting an accommodation or complaining of discrimination.

After hearing the evidence at trial, I find that plaintiff carried his burden of proving that he was "disabled" as that term is defined under the Act. I find, though, that plaintiff was not qualified to perform the essential functions of the Box Section job to which he sought a transfer. I also find that the USPS reasonably accommodated plaintiff in his employment by allowing him to work on the handicapped case and did not otherwise retaliate against him.

## DISCUSSION

### I.  The Rehabilitation Act

The Act protects individuals with disabilities from discrimination in employment solely because of the disability, and provides:

> No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program receiving Federal financial assistance ....

29 U.S.C. § 794(a). An employer discriminates under the Act by, *inter alia,* not making a "reasonable accommodation to the known physical or mental limitations" of an otherwise qualified disabled employee, unless the employer can show that the accommodation would impose "an undue hardship" on the operation of its program. 45 C.F.R. § 84.12(a).

The standards used to determine whether an employer has violated the Rehabilitation Act are identical to those applied under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12111 *et seq.* *See* 29 U.S.C. § 794(d) (1992 amendment that applied the standards of the ADA to complaints of discrimination to the Rehabilitation Act); *Rodriguez v. City of New York,* 197 F.3d 611, 618 (2d Cir.1999) (the Rehabilitation Act and the ADA impose "identical" requirements).[1]

### II.  Definition of "Disability" Under The Act

The first element plaintiff must prove is that he is disabled within the meaning of the Act. The Act defines an "individual with a disability" as a person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such impairment, or (iii) is regarded by his employer as having such an impairment. 29 U.S.C. § 705(20)(B). Here, plaintiff is relying on the first definition of disability.

In *Bragdon v. Abbott,* 524 U.S. 624, 631, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998), the United States Supreme Court established a three-part test for determining whether an impairment meets the definition of a "disability" under both the ADA and the Rehabilitation Act. First, a court must determine whether plaintiff has a physical impairment. Next, the court must identify the "life activity" involved

---

**1.** As such, litigants (including the parties here) and courts interchangeably rely on case law analyzing claims brought under the ADA and the Rehabilitation Act.

and determine whether it constitutes a "major life activity" as defined by the Act. *Id.* at 637, 118 S.Ct. 2196. Third, the court must determine "whether the impairment substantially limited the major life activity." *Id.* at 639, 118 S.Ct. 2196.

■ In this case, I do not believe that the USPS disputes the fact that Trobia has a physical impairment related to his back.[2] Whether the USPS concedes that or not, I find as fact, based on the record evidence, that Trobia does suffer from such an impairment. The important question, though, is whether this impairment affects a major life activity, and if so, whether the effect is "substantial". ·

The Rehabilitation Act does not define major life activity with great specificity but lists general functions such as "caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working" as examples of major life activities. *See* 45 C.F.R. § 84.3(j)(2)(ii). The list promulgated there is illustrative and not exhaustive. *Bragdon*, 524 U.S. at 639, 118 S.Ct. 2196. Only significant impairments enjoy the protection of the Act and the ADA. As the Second Circuit noted:

> we have emphasized that '[t]he need to identify a major life activity that is affected by the plaintiff's impairment plays an important role in ensuring that only significant impairments will enjoy the protection of the ADA' (citations omitted).

*Colwell v. Suffolk Co. Police Dep't,* 158 F.3d 635, 642 (2d Cir.1998). With this in mind, the Second Circuit has identified other major life activities as sitting, standing, lifting, and reaching. *See Ryan v. Grae & Rybicki,* 135 F.3d 867, 870 (2d Cir.1998) (quoting U.S. Equal Employment Opportunity Commission, Americans with Disabilities Act Handbook 1–27 (1992)); *Colwell,* 158 F.3d at 642; *see also* 29 C.F.R. Pt. 1630 App. Section 1630.2(i) (identifying sitting, standing, lifting, and reaching as major life activities).

In both the amended complaint (Dkt.# 10, ¶ 21) and plaintiff's pretrial statement (Dkt.# 38) it is suggested that plaintiff's impairment affected his ability to walk, sit and stand for prolonged periods.[3] Plaintiff also testified at trial about how his back impairment substantially affected his ability to do these things. (Tr. 15–19).[4] I find as a fact that plaintiff has identified the ability to walk, sit and stand as the major life activities that his impairment affects. I further find as a conclusion of law that all are major life activities within the meaning of the Act. *See Colwell,* 158 F.3d at 643; *Ryan,* 135 F.3d at 870.

The final requirement of *Bragdon,* and perhaps the most important, is whether the impairment *substantially* limits a major life activity. Clearly, every impairment affects a major life activity to some degree, but the statute is implicated only if the impairment substantially limits such

---

**2.** Regulations implementing the Act define "physical or mental impairment" to mean: (A) any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs, cardiovascular; reproductive; digestive; genito-urinary; hemic and lymphatic; skin; and endocrine .... 45 C.F.R. § 84.3(j)(2)(i).

**3.** The USPS argued in its post-trial memorandum that plaintiff failed to prove that his impairment significantly limited his ability to care for himself or to work. (Dkt.# 37). These arguments are not relevant, though, because plaintiff does not claim that his back impairment limited the major life activities of "caring for oneself" or "working."

**4.** "Tr." signifies the transcript of the trial.

activity. Because the Rehabilitation Act regulations provide no guidance, courts look to the EEOC's regulations implementing the ADA to determine whether an activity is substantially limited. *See Colwell,* 158 F.3d at 643.

Those regulations define "substantially limits" as "(i) [u]nable to perform a major life activity that the average person in the general population can perform; or (ii)[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1). The regulations also instruct that courts should consider certain factors regarding the impairment to determine whether it is substantially limiting, including its nature and severity, its duration or expected duration, and its permanent or long term impact. *Id.* at § 1630(j)(2); *Colwell,* 158 F.3d at 643; *Ryan,* 135 F.3d at 871–72.

As discussed below, I find that the evidence demonstrates that plaintiff had an impairment that significantly restricted the condition, manner or duration under which he could sit, stand, and walk as compared to the average person in the general population. 29 C.F.R. § 1630.2(j)(1)(ii).

### Medical Evidence of Plaintiff's Disability

Much of the trial testimony centered on plaintiff's medical condition, the reports of his physicians, and the USPS's response to those matters. Dr. Sewell Miller and Dr. Thomas Rodenhouse performed a spinal fusion on Trobia on August 25, 1993. Plaintiff's back condition caused by the spinal fusion is the basis for plaintiff's claim of disability under the Act.

Miller was Trobia's principal treating physician until Miller retired June 1996, at which point Dr. Rodenhouse was responsible for plaintiff's care. Dr. Miller testified that a spinal fusion requires six to twelve months for recovery. (Tr. 366). Dr. Miller's testimony and his contemporaneous reports depict a patient who recovered quite well from the spinal fusion, with few restrictions. About six months after the surgery, Miller wrote to the USPS on January 15, 1994. (Ex. 484). Dr. Miller described Trobia's condition as "progressing well" and opined that Trobia should be able to return to work in July, 1994 "based on his back's stability and rate of healing." He gave Trobia permission to do leg strengthening and upper extremity exercises. He stated that Trobia would never be allowed to do any "significant heavy lifting" but that he should be able to carry out most routine activities. Five months later, Dr. Miller wrote to the USPS again, by letter dated July 8, 1994. (Ex. 485). In that letter, he described Trobia has "coming along nicely," and noted that he was walking around "with virtually no back or leg pain." He also noted that Trobia had "good flexion/extension at the waist."

Trobia returned to work part-time on July 25, 1994, to a limited light duty position in the Box Section. He had a 10 lbs. lifting restriction with intermittent sitting, walking, bending, squatting, climbing, kneeling, and standing required. On September 20, 1994, Dr. Miller wrote to USPS and authorized Trobia to return to work full-time. (Ex. 406). Dr. Miller noted that Trobia may have some "aches and pains," but that he should do well at work. He described Trobia as having "a moderate permanent partial disability."

About four months later, on January 26, 1995, Dr. Miller wrote to the USPS and advised that Trobia "has recovered nicely." He still had "some aches and pains," but

they were not as severe as they had been. He described Trobia as having learned to work with his condition and as "functioning well." He also noted that Trobia was able to play golf and he indicated he would see Trobia for follow-up in about a year. (Ex. 13).

It was only when plaintiff was removed from his position in the Box Section in January 1996, that plaintiff complained to Dr. Miller and officials at USPS that he had difficulties in his employment. In connection with Trobia's removal from the Box Section, Cathleen Taylor, a Human Resource Specialist, wrote to Dr. Miller and requested his comments on the suitability of Trobia's new job as a modified distribution clerk. (Ex. 408).

Dr. Miller responded a few days later, in a one-page letter dated January 15, 1996. (Ex. 409). Several things are notable about this letter. The letter notes that Miller had not seen Trobia for over a year. He noted that Trobia had been working steadily. He also noted that based on x-rays, the fusion procedure looked good and that Trobia was "having minimal problems with the back." *Id.* Miller further stated that he "tend[ed] to agree" with plaintiff that he may have "problems" in the new job, as it was described by plaintiff. He thought that plaintiff should stay in his current position in the Box Section. *Id.*

After the USPS received Miller's letter, Miller was advised that the prior job in the Box Section was no longer available and Taylor asked Miller what modifications would make the new job offer appropriate. (Ex. 412). Trobia was advised by letter of the same requirement. (Ex. 411). In response, Dr. Miller submitted a two-paragraph letter on February 7, 1996, and this time included a work restriction evaluation which limited plaintiff to sitting for a maximum of five to ten minutes, to standing for zero to ten minutes, and to walking for no more than twenty minutes. (Ex. 413). Dr. Miller did not speak specifically to the new job, but indicated that Trobia must be able to change positions, move around, and not be required to sit for a prolonged period. He indicated that Trobia could walk as long as he can change positions frequently, but cannot stand very long. *Id.*

In April, 1996, Miller again wrote to the USPS and claimed that Trobia suffers if he has to lean forward and pitch mail. (Ex. 417). Miller again stated that intermittent sitting, walking and standing were indicated and that plaintiff was restricted to lifting 10–20 pounds. At this time, Miller also restricted plaintiff to working four hours a day in light of plaintiff's recurrent back problems. (Ex. 417).

Dr. Rodenhouse gave plaintiff these same restrictions in a November 1996 work restriction evaluation, including intermittent sitting, walking, and standing, and a four-hour work day. (Ex. 424). Further, in March 1997, Dr. Rodenhouse informed the USPS that plaintiff could no longer pitch mail at all because he had begun to experience new problems in his cervical spine with radiation of pain down both arms. (Ex. 429). Dr. Rodenhouse also noted that plaintiff still needed to be able to change positions frequently because he was "significantly restricted" in his ability to sit, stand, and walk. *Id.*

At trial, plaintiff testified that, at all times relevant to his claims, he had great difficulty standing in one place for five, ten, or fifteen minutes at a time without experience pain, and that after one-half hour of walking, he needed to sit down. (Tr. 15–16). He further testified that he has "trouble with prolonged sitting ... [and] just being sedentary starts to affect [his] back and [he] start[s] to become really uncomfortable" and has to stand. (Tr. 16).

Plaintiff's testimony about the effects that his back impairment had on his ability to sit, stand, and walk is corroborated by the medical evidence that the USPS received from Drs. Miller and Rodenhouse in 1996 and 1997. (Exs. 413; 417; 424; 428). Further, Dr. Robert Knapp, a neurologist who conducted an independent medical evaluation of plaintiff in December 1996 at the request of the USPS, found that plaintiff had many restrictions, including an inability to sit for more than ten minutes, at which time he needed to ambulate for five or ten minutes and then sit again. (Ex. 428).

Conflicting evidence was presented at trial that plaintiff's impairments did not always significantly affect these major life activities. Further, it is clear that representatives of the USPS did not believe that Trobia's maladies were of such a nature that they came within the purview of the Act. (Tr. 690–691). The USPS was aware that plaintiff was performing activities outside the work place that seemed inconsistent with the claimed work restrictions. For example, John Heberle, Manager of Distribution Operations at the Jefferson Road Distribution Center, reported that on April 20, 1996, he personally observed Trobia sit through an entire two-hour movie without once getting up. That same night, he observed Trobia sitting at dinner for over an hour. (Ex. 53). USPS was suspicious enough of plaintiff that they conducted surveillance of plaintiff at a later time and those tapes of plaintiff's activities were received in evidence. Those tapes showed plaintiff engaging in various physical activities, including playing golf.

Moreover, in a physical activities questionnaire that plaintiff completed on September 11, 2001, Trobia lists many activities that he was able to perform in certain circumstances. (Ex. 440). Concerning golf, Trobia admitted playing golf "a couple of times a week." *Id.*

Despite this conflicting evidence, I find that plaintiff has presented sufficient evidence that he was disabled within the meaning of the Act. It is clear that plaintiff's physicians, as well as an independent medical examiner, consistently were' of the opinion that plaintiff's abilities to sit, stand, and walk were significantly restricted. I find as a matter of law that, when compared to the average person in the general population, the condition, manner and duration under which plaintiff could sit, stand, and walk were significantly restricted. 29 C.F.R. § 1630.2(j)(1)(ii). As a result, plaintiff has met his burden of proving that he was disabled within the meaning of the Act. *See E.E.O.C. v. Yellow Freight System,* No. 98 Civ. 2270, 2002 WL 31011859, *17 (S.D.N.Y. Sept. 9, 2002) (plaintiff who was unable to sit longer than forty-five minutes was "substantially limited" in the major life activity of sitting and was considered disabled under ADA); *Meling v. St. Francis Coll.,* 3 F.Supp.2d 267, 273–74 (E.D.N.Y.1998) (plaintiff who could not sit or stand more than ten to fifteen minutes was "substantially limited" in the major life activities of sitting and standing and disabled under ADA).

### III. "Qualified" Person With A Disability Under The Act

■ To prevail on his Rehabilitation Act claim, plaintiff next must show that he was qualified to perform the essential functions of the job, with or without a reasonable accommodation. 45 C.F.R. § 84.3(k)(1); *see also Jackan v. New York State Dep't of Labor,* 205 F.3d 562, 566–67 (2d Cir.2000); *Borkowski v. Valley Cent. Sch. Dist.,* 63 F.3d 131, 137 (2d Cir.1995). Plaintiff must show either that he "can meet the requirements of the job without assistance, or that an accommodation exists that permits

[him] to perform the job's essential functions." *Borkowski*, 63 F.3d at 138.

I find that plaintiff did not meet this burden with respect to the Box Section position. Trobia's duties in the Box Section included waiting on customers; sitting at a desk doing paperwork related to insured mail; renting post office boxes; and distributing or "sticking" mail in the cases containing customer post boxes. (Tr. 155–56).

I find as a fact that Trobia was not performing all of the essential functions of the position during his stay in the Box Section. Plaintiff's manager, John Heberle, testified that Trobia did not perform all the functions of the Box Section. He consistently did only "light" work, could not lift mail bags in excess of twenty pounds. In addition, he did not stick mail in the post office boxes, all of which were requirements of the job. (Tr. 535).

Other employees, Alice Bivens and Carolyn Bailey, who worked in the Box Section with Trobia, as well as a supervisor, John Sodeman, all confirmed that Trobia did not perform all of the functions required. Trobia principally waited on customers at the window, while other employees rotated various responsibilities in the Box Section, including "sticking" mail. Plaintiff was not part of that rotation. He only did paperwork and served customers. (Tr. 328, 598, 620–23).

The fact that the USPS allowed plaintiff to work in the Box Section from 1994 until January 1996 without performing certain functions (like "sticking" mail in rotation with the other clerks) does not mean that these functions were not essential functions of the job within the meaning of the Act. *See Phelps v. Optima Health, Inc.*, 251 F.3d 21, 26 (1st Cir.2001) ("evidence

that accommodations were made so that an employee could avoid a particular task merely shows the job could be restructured, not that [the function] was non-essential.... To find otherwise would unacceptably punish employers from doing more than the [Act] requires, and might discourage such an undertaking on the part of employers.")(internal quotations and citations omitted); *see also Basith v. Cook County*, 241 F.3d 919, 930 (7th Cir. 2001) ("The fact that restructuring is feasible, in itself, is not persuasive evidence one way or the other that a function is essential to a job."). I find that the functions plaintiff was not performing in the Box Section were essential functions.

Trobia also claims, though, that the USPS violated the Act by requiring him to work on the handicapped case and for not placing him in another position that was consistent with his medical restrictions. Although there was little proof at trial on this point, I will assume, without deciding, that there were other positions at the USPS of which plaintiff could perform the essential functions.[5] Therefore, I must decide whether the USPS's actions of failing to find a position for plaintiff other than the handicapped case violated the Act based on an alleged failure to accommodate.

## IV. Reasonable Accommodation and Retaliation

Trobia's failure to accommodate and retaliation claims essentially are based on two things: (1) the USPS removing plaintiff from the Box Section; and (2) the USPS transferring him to the handicapped case, where he worked from January 1996 through June 1997.

---

5. John Heberle, plaintiff's manager, conceded on cross-examination that there were other jobs at the USPS that seemed to fit within plaintiff's restrictions. (Tr. 540–44).

■ Concerning "accommodation", the burden is on the USPS to show that the accommodation it offered plaintiff was "reasonable." *Jackan*, 205 F.3d at 567. The regulations provide at 45 C.F.R. § 84.12(b) that a "reasonable" accommodation may include: "(1) Making facilities used by employees readily accessible to and usable by handicapped persons, and (2) Job restructuring, part-time or modified work schedules, acquisition or modification of equipment or devices, the provision of readers or interpreters, and other similar actions." Whether a particular accommodation is "reasonable" must be judged in the context of the particular circumstances in any given case and is a fact-specific inquiry. *Borkowski*, 63 F.3d at 138.

After considering all the evidence and weighing the credibility of the witnesses, I find that none of the actions by the USPS violated the Act by failing to accommodate or by retaliating for engaging in protected activity. The USPS has met its burden of demonstrating that the accommodations it provided plaintiff were reasonable within the meaning of the Act. The accommodations may not have been to plaintiff's liking, but they were not inconsistent with his needs and limitations as directed by his physicians. Furthermore, I find that plaintiff failed to establish that the USPS engaged in retaliation.

### 1. Plaintiff's Removal From The Box Section

■ As discussed above, I find that plaintiff cannot prevail under the Act based on his removal from the Box Section or the USPS's failure to return him there because he has not shown that he could perform all of that job's essential functions. (*See* part III., *supra*). Nevertheless, even assuming that he could perform the essential functions of that job, I find as a fact that Trobia's removal from the Box Section was not motivated by discrimination on account of a disability or in retaliation, and did not constitute a failure to accommodate under the Act. There were legitimate operational reasons why plaintiff was removed from the Box Section, and they were not related to plaintiff's disability. The USPS was not obligated to return plaintiff to the Box Section.

Several witnesses testified about the events surrounding Trobia's removal from the Box Section on January 12, 1996. The immediate event that caused Trobia's removal was an altercation between Trobia and other employees in the Box Section. Both Alice Bivens and Carolyn Bailey testified about an incident on January 12, where plaintiff had criticized another employee. (Tr. 600–01, 626). This was not the first incident with Trobia. Bivens and Bailey had previously complained to a supervisor (Nancy Premo) about Trobia. Bailey testified that Trobia's attitude was bad enough that Box Section employees had met with John Heberle, the Operations Manager at the facility. (Tr. 599, 625–26).

On January 12, 1996, Thomas Johnson, a Supervisor, was approached by Alice Bivens who was very upset about what had just occurred in the Box Section, and she told Johnson that "they had to get Trobia out of the Box Section." (Tr. 606–07). Sodeman, who was also aware of the problems with Trobia, accompanied Johnson and together they met with Heberle and recommended that Trobia be removed from the Box Section because of the altercation among the employees. (Tr. 626–28, 509–510). Trobia was removed immediately on that day and never returned.

Heberle testified that there were several reasons for Trobia's removal, in addition to the altercation with his coworkers. Both Heberle and a Labor Relations Specialist

at USPS, Frank L. Liberti, testified that union representatives and management had met in the Fall of 1995 and discussed creating several limited duty positions to assist employees, like Trobia, who were recovering from illnesses and injury. (Tr. 495–500, 503, 678, 681). Trobia's name was mentioned in those meetings, and it was generally determined that Trobia eventually would be moved to a new position.

The altercation on January 12 required that the USPS address the issue sooner than had been planned and Trobia was removed immediately. Heberle testified though that this move had been discussed with the union, and mentioned to Trobia, before the January 12 incident. When the altercation occurred among the employees, Heberle testified that Trobia was the logical choice for transfer. In Heberle's view, Trobia was not performing the essential functions of the Box Section position, and he had no "bid rights" or protection under the union contract because of his limited duty status.[6]

At trial, Trobia himself conceded that there had been personnel problems in the Box Section. He admitted that he had criticized Bivens and others for making mistakes pitching mail, and he objected to their listening to a particular radio station. (Tr. 187–92). He conceded that on the day he was transferred, Sodeman told him that he had been removed because there were problems with co-workers and, in any event, the USPS had already made a decision to move plaintiff from that position. (Tr. 172–73).

I find as fact that the removal of Trobia from the Box Section on January 12, 1996, was not motivated by any discriminatory reason, but for legitimate operational rea-

sons. Based on the evidence before me and my assessment of the credibility of the witnesses, I find as fact that there were conflicts among the employees in the Box Section and management's decision to alleviate those problems by removing Trobia was not caused by Trobia's alleged disability or in retaliation for any protected activity. The conflicts among the employees was ample reason for USPS to move plaintiff.

■ Trobia repeatedly sought to return to the Box Section, a position that he obviously preferred. I find that plaintiff's complaints in this lawsuit are motivated in large part by his desire to return to the Box Section, a position he viewed as quite favorable. Trobia claims that USPS's refusal to return him to the Box Section violated the Act. I disagree. Neither the facts developed at trial nor the law supports plaintiff's claim.

■ First of all, no employee has the "right" to insist that he work in a particular job and there is no requirement under the Act that USPS must place plaintiff in the job of his choice. Although an employer may consider an employee's preferred accommodation, the Act "does not require the employer to provide every accommodation the disabled employee may request, so long as the accommodation provided is reasonable." *Fink v. New York City Dep't of Personnel*, 53 F.3d 565, 567 (2d Cir. 1995). In this regard, " '[t]hat [the employer] could have provided a different set of reasonable accommodations or more accommodations does not establish that the accommodations provided were unreasonable or that . . . additional accommodations were necessary.' " *Misek–Falkoff v. Int'l Bus. Machs. Corp.*, 854 F.Supp. 215, 228

---

6. A week after Trobia's removal from the Box Section, he filed a grievance (Ex. 139) that was rejected and the union elected not to appeal because plaintiff had no contractual rights to work in the Box Section. (Ex. 139A).

(S.D.N.Y.1994), *aff'd,* 60 F.3d 811 (2d Cir. 1995) (citing *Wynne v. Tufts Univ. Sch. of Med.,* 1992 WL 46077 (D.Mass.), *aff'd,* 976 F.2d 791 (1st Cir.1992)).

Second, the fact that Trobia worked in the Box Section for a period of time, although unable to perform all the essential functions of that job did not create any vested rights to continue to do so. The USPS should not be punished from being more generous to plaintiff by allowing him to remain in a job that he was unable to perform. *See Fink v. New York City Dep't. of Personnel,* 855 F.Supp. 68, 72 (S.D.N.Y.1994), *aff'd,* 53 F.3d 565 (2d Cir. 1995) ("There is no provision requiring the employer to take account of the disabled individual's preferences in choosing the means of accommodation."); *Querry v. Messar,* 14 F.Supp.2d 437, 445 (S.D.N.Y. 1998) ("An employer need only offer a 'reasonable accommodation'; it need not provide the employee with the accommodation of her choice."); *see also Phelps,* 251 F.3d at 26; *Basith,* 241 F.3d at 930. Therefore, the USPS did not violate the Act by removing plaintiff from and failing to return him to the Box Section.

## 2. The Modified Distribution Job Offer and The Handicapped Case Job

██ Following his removal from the Box Section, the USPS presented plaintiff with a permanent job offer for a limited duty position on a "modified distribution case." (Ex. 410). This job offer was crafted by the USPS based on the medical information it then had from plaintiff about his restrictions. The position required "simple grasping ability" and normal handling of objects of up to fifteen pounds in weight. "The work is basically standing with alternate periods of sitting while performing sedentary activities." (Ex. 410). The work would have required that Trobia use what is known as a "standard rest bar" which is a device similar to a stool that he could have leaned against while distributing mail. (Ex. 481).

Plaintiff claims that the USPS failed to accommodate his disability after removing him from the Box Section by offering him this job in its place because it did not fit within his medical restrictions. I disagree. The evidence shows that the USPS asked plaintiff's treating physician, Dr. Miller, for a suitability determination regarding the modified distribution case job. (Ex. 408). I find that, based on the information the USPS had about the work that plaintiff performed in the Box Section, as well as the medical information in his file at the time the offer was made, the modified distribution case job offer was a reasonable offer of accommodation. Trobia actually accepted the offer on January 18, 1996, but conditioned it on his doctor's approval.

In response to the USPS's request regarding this position, Dr. Miller indicated that the prior position in the Box Section was preferred over this position, although there is little in Dr. Miller's correspondence, or in his testimony at trial, to support such a conclusion. In fact, it is clear from Dr. Miller's January 15, 1996 letter, and from Dr. Miller's testimony at trial, that Miller was primarily regurgitating Trobia's concerns about the proposed job, not his own medical opinion. Miller also mischaracterized the nature of the modified distribution case job in his correspondence to the USPS, something that he conceded at trial. (Tr. 373). I credit testimony of Frank Liberti that Trobia's proposed job at the modified distribution case did not involve what Miller claimed it did. The job did not involve moving packages; it did not involve leaning out; it only would have involved placing letters and magazine size papers (flats) in postal boxes. (Tr. 687–88).

Based on my review of the evidence, and based on my assessment of the credibility of the witnesses, I believe that plaintiff wanted to be placed in the Box Section because he viewed that as a better job, and that he balked at working in the offered job—one designed for limited duty. Although both Miller and Trobia urged that he be returned to his former position in the Box Section, Miller's correspondence was not clear as to why plaintiff could not perform the job at the modified distribution case. The requests were made to advance Trobia's personal preference for the Box Section. At no time did plaintiff or his physician suggest any modification to or accommodation for the job as offered, other than a blanket request that he go back to the Box Section. That accommodation was not available and would not have been reasonable anyway. (Tr. 686–87).

Although the USPS offered plaintiff a job on the modified distribution case, it is undisputed that plaintiff never actually worked in that position. Instead, plaintiff told his supervisor that, based on his previous experience, he could not use the standard rest bar because it would have aggravated his back. That same day, the USPS immediately accommodated plaintiff and offered him a different job altogether. (Tr. 332–335; 687).

The new job offer was for work on a "handicapped" distribution case. Work on this mail distribution case was specifically designed and reserved for employees recovering from injuries. The job consisted of plaintiff sitting in a chair with arms (as opposed to leaning back on a standard rest bar) and placing mail into a case that was positioned differently than the case involved on the "modified" distribution case. Unlike the first job offered to him, the handicapped case involved placing mail into boxes that had been altered so that the employee need not stoop or reach up high to perform the distribution, but basically sorted mail at eye level. (Ex. 122–24). As designed, this was hardly an onerous job. Plaintiff did not balk at being placed at the handicapped case in January 1996, and he remained there until June 1997.

Plaintiff argues the handicapped case job was not a "reasonable" accommodation because it did not fit with his medical restrictions and made that condition worse. I disagree. I find that the USPS's placement of Trobia in the handicapped case job during this time period did not violate the Act and was not a failure to accommodate his disability. I also find as fact that the handicapped case position fit within plaintiff's medical restrictions, including the February and April work restriction evaluations of Drs. Miller and Rodenhouse. (Exs. 417; 424). Moreover, contrary to what plaintiff asserts, the USPS did not ignore Trobia's protestations when he began experiencing difficulty in this position.

In this position at the handicapped case, plaintiff was allowed to sit, stand, and walk around the facility for periods of time consistent with his medical restrictions. Plaintiff decided on his own when to sit, stand, and walk based on his tolerance and pain level. (Tr. 199). With the exception of certain reasonable restrictions as to where plaintiff could walk at the facility during the workday, the USPS did not restrict plaintiff in any manner, concerning his need to take breaks and change positions. Trobia conceded on cross examination that, at the handicapped case, he worked at his own pace and there were no minimum production standards that he had to meet. (Tr. 199). Plaintiff's managers also testified that no production standards were required. Heberle and Liberti testified that when plaintiff complained about working on the handicapped case,

little was asked of plaintiff and no requirements were placed on him while the USPS worked with plaintiff and his doctors to find a suitable position for him. (Tr. 539; 692–93).

In April 1996, plaintiff complained that this new job was exacerbating his back condition. He again requested that he be returned to the Box Section. I find that most of plaintiff's objections related to his persistent request to return to the Box Section. Plaintiff asserted that if he were to remain on the handicapped case, he would need to work only four hours a day. The USPS reasonably accommodated plaintiff by reducing his work to four hours a day. Plaintiff's managers continued to give plaintiff free rein to change his physical position, move about and work at his own pace.

Plaintiff continued to work on the handicapped case for four hours a day throughout the fall of 1996. Eventually, the USPS sent him for an independent medical examination with Dr. Knapp. (Ex. 70). Dr. Knapp's report did not preclude plaintiff from working in the handicapped case, but restricted plaintiff, as did Dr. Miller, in several respects. He limited weight lifting to 15–20 pounds and limited plaintiff's sitting to 10 minutes at a time with breaks of 5–10 minutes to stand and ambulate. Working overhead (i.e., with arms raised) was limited to two hours a day. (Ex. 70).

There is no evidence in the record that the handicapped case job was inconsistent with these restrictions. I credit the testimony of Liberti, who stated that the handicapped case job was consistent with the restrictions that plaintiff's doctors imposed in 1996. (Tr. 692). Dr. Rodenhouse also testified that plaintiff could tolerate sorting mail for periods of time so long as he could alternate positions and could work at his own pace. (Tr. 657–58).

In the Spring of 1997, once the USPS received medical evidence from plaintiff's physicians that the handicapped case job had begun to create strain on plaintiff's cervical spine, the USPS immediately began to make changes to the position. Liberti testified that he told plaintiff not to pitch mail while the USPS began to devise another job for plaintiff. (Tr. 693–94). At or about this time, the plaintiff was sent to another job for five weeks where he verified polling questionnaires for the USPS and did not pitch mail. (Tr. 202). Plaintiff made no complaints about that job.

In June 1997, after obtaining a suitability determination from Dr. Rodenhouse, the USPS offered plaintiff a different position in "Revenue Protection" which did not involve any distribution of mail. Plaintiff accepted that job and testified that he was capable of performing it. (Tr. 207–08). Because plaintiff had surgery on his knee that summer, he was out of work and did not actually start in Revenue Protection for several months until September 1997. Plaintiff worked in that job until January 2001, when he was out of work again for approximately ten months recuperating from surgery to remove the "hardware" that had been inserted during the spinal fusion operation in 1993. Plaintiff was cleared to work after that surgery and received another job "checking zip codes" which involved no mail distribution. (Tr. 702). Plaintiff could perform that job, has not complained about it, and he continues in that position today.

In light of this evidence, and the evidence at trial, I find that the USPS has sustained its burden of proof that the accommodations offered to plaintiff were reasonable within the meaning of the Act. As such, plaintiff's claim must fail. *Gronne v. Apple Bank for Sav.*, No. 98–CV–6091, 2000 WL 298914, *6 (E.D.N.Y. Feb.14, 2000), *aff'd,* 1 Fed. Appx. 64, 2001

WL 30647 (2d Cir.2001) (employer's accommodations of restructuring plaintiff's duties in accordance with her restrictions were "reasonable" under ADA as a matter of law); *McLean–Nur v. Dep't of Transp., City of New York*, No. 98 Civ. 819, 2000 WL 297176, *7 (S.D.N.Y. Mar.21, 2000) (same); *see also Querry*, 14 F.Supp.2d at 445 (employer satisfied its obligations under the Act to reasonably accommodate plaintiff by offering her light duty assignments).

I also find that plaintiff failed to prove that the USPS retaliated against him. Claims for retaliation under the Rehabilitation Act are analyzed under the same burden-shifting framework established for Title VII cases. *Weixel v. Bd. of Educ. of the City of New York*, 287 F.3d 138, 148 (2d Cir.2002). Here, there is no evidence that the USPS took any adverse employment action against him based on his prosecuting a claim with the EEOC. Further, the USPS has offered nondiscriminatory reasons for the actions it took and plaintiff has failed to show that these reasons were a pretext for disability discrimination. Further, as the factfinder, I see no credible evidence of retaliatory animus by the USPS based on Trobia's EEOC claim or the filing of this lawsuit.

Finally, I find no evidence that the USPS somehow failed to engage in the so-called interactive process with plaintiff.[7]

As is evident from the volume of exhibits filed by both sides in this case, and the amount of written correspondence between plaintiff, his physicians, independent physicians, the USPS, and other governmental agencies, the parties always remained in constant communication with each other regarding plaintiff's restrictions, the requirement of medical documentation, and plaintiff's ability to perform certain jobs. Although there was evidence that, in some instances, the USPS did not move as quickly as might be preferred with respect to plaintiff's requests, and that there were delays that occurred in the administrative process, I do not find that the USPS's actions were "unreasonable" or amounted to a failure to accommodate plaintiff's disability under the ADA.

The process of finding a disabled employee a suitable placement is not an easy or predictable task. Even plaintiff's physician, Dr. Rodenhouse, testified at trial that plaintiff's ability to perform any given job was a "trial and error" determination and depended on his ability to sit, stand, and move around as needed. (Tr. 657–58). Although plaintiff feels that the USPS should have done things differently, or should have given him his job of choice, I find that the USPS acted in accordance with the letter, purpose, and spirit of the Act and did not engage in discrimination based on plaintiff's various disabilities.[8]

---

**7.** The Second Circuit has not yet determined whether the failure to engage in the interactive process is itself a violation of the ADA or the Rehabilitation Act. *See Lovejoy–Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 219 (2d Cir.2001). Because I find that the USPS did engage in this process, I need not decide this issue.

**8.** I am aware that the EEOC considered plaintiff's claims of discrimination and rejected them in part and ruled in plaintiff's favor in part. The EEOC found no discrimination in failing to return plaintiff to the Box Section

which was plaintiff's primary request before the EEOC. The EEOC determined that there was a legitimate reason for plaintiff's removal from the Box Section, and he had no rights to be returned there.

The EEOC did determine, based primarily on Dr. Miller's January 15th and February 7, 1996 letters, that the USPS failed to accommodate plaintiff relating to his medical restraints in connection with the manual distribution jobs. It is well settled that I am not bound by any determination of the EEOC. *See Rosenfeld v. Dep't of Army*, 769 F.2d 237, 240 (4th Cir.1985) ("[A]dministrative res judicata,

## CONCLUSION

For the foregoing reasons, I find in favor of defendant, William J. Henderson, Postmaster, United States Postal Service, on all of plaintiff's claims that the defendant violated the Rehabilitation Act. Plaintiff has failed to prove his claims by a preponderance of the evidence. Final Judgment shall be entered in favor of defendant and the complaint is dismissed with prejudice.

IT IS SO ORDERED.

however, is inapplicable where legislative policy favors an independent determination of the issue in question in another tribunal. Restatement (Second) of Judgments § 83(4)(b) (1982). The anti-discrimination statutes present the best example of such a policy."); accord Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104, 112–13, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991) ("Administrative findings with respect to the age-discrimination claims of federal employees enjoy no preclusive effect in subsequent judicial litigation.").

Furthermore, there was significant, additional evidence before the Court at trial that was not before the EEOC concerning plaintiff's restrictions. In addition, Dr. Miller's initial findings were significantly undermined by his testimony at trial where he conceded that his original characterization of plaintiff's job was incorrect, presumably based on faulty information supplied to him by plaintiff.

In any event, once the EEOC's determination was made in 2001, plaintiff had long since left the handicap distribution job and was either on another medical leave or had been working in positions that he was capable of performing, including verifying polling questionnaires, revenue protection, or checking zip codes.