Lisa M. REILLY, Plaintiff,

v.

REVLON, INC., Robert C. Krasner, and Linda Piacentini, Defendants.

No. 08–CV–0205 (CM).

United States District Court, S.D. New York.

May 12, 2009.

Evan S. Sarzin, Evan Sarzin, P.C., New York, NY, for Plaintiff.

Jonathan Marc Kozak, Jackson Lewis LLP, White Plains, NY, Todd H. Girshon, Jackson Lewis LLP, New York, NY, for Defendants.

## MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COLLEEN R. McMAHON, District Judge.

Plaintiff Lisa Reilly ("Reilly") filed this action against Defendants Revlon, Inc. ("Revlon") and Revlon employees Dr. Robert Krasner ("Krasner") and Linda Piacentini ("Piacentini") alleging employment discrimination and wrongful termination.

Plaintiff asserts ten causes of action against some or all Defendants pursuant to the: Americans with Disabilities Act of 1990, 42 U.S.C. § 12112(b)(5)(A); Pregnancy Discrimination Act of 1978, 42 U.S.C. § 2000e et seq.; the Family Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 et seq.; New York State Human Rights Law, N.Y. Exec. Law §§ 296.1(a), 296.6; and, New York City Human Rights Law N.Y. Admin. Code § 8–107.

Defendants collectively move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, defendants' motion is granted in part and denied in part; Plaintiff's claims for disability discrimination will be tried, but the rest of her claims are dismissed.

## I. STATEMENT OF RELEVANT FACTS

*The Cast of Characters*

Plaintiff Reilly was employed in Revlon's Medical/Health Services Department. (D. Rule 56.1 Stmt. ¶¶ 16, 19, 26–28.) The Medical Services Department provided medical care for Revlon employees and was staffed by Defendant Krasner as director of the department, a nurse practitioner, and Reilly. (*Id.* ¶¶ 22, 70.)

Reilly began working as an at-will employee in the Medical Services Department in 1995. (*Id.* ¶¶ 15, 16, 19.) Revlon hired her as an administrative assistant to both the Department and Krasner, but her responsibilities increased over time to include duties relating to human resources and employee supervision. (*Id.* ¶¶ 23, 27.) Revlon eventually promoted Reilly to "Manager of Medical Services" she directly supervised nurse clinicians, nurse practitioners, and administrative assistant leaves of absence. (Dep. Tr. of Lisa Reilly 145:13–21 (hereinafter "Reilly Dep. Tr.")).

Dr. Krasner graduated from medical school in 1971. (*See* D. Rule 56.1 Stmt.

¶ 6.) Prior to working at Revlon, Dr. Krasner held a diverse set of medical positions. He assisted with Sub–Saharan famine care in Ethiopia; worked with both the Panamanian government and the Indonesian Ministry of health; worked as physician to the U.S. embassy in London; was the Director of Medical Services and Clinical Admiral to the Naval Hospital; and treated members of both Congress and the Supreme Court as the attending physician to Congress. (*Id.* ¶¶ 7–10.) For the last ten years, Dr. Krasner has been the Medical Consultant for MacAndrews & Forbes Holding, Inc., Revlon's largest shareholder. (*Id.* ¶¶ 11, 22.) Revlon set up its Medical Services department at Dr. Krasner's request. (*Id.* ¶ 22.)

While Reilly worked in the Medical Services Department, she had a close relationship with Krasner. Dr. Krasner provided various medical services to both Reilly and her parents. (*Id.* ¶ 38.) Reilly and her family members asked Dr. Krasner for assistance with medical and not-medical problems during her employment. (*Id.* ¶ 39.) He made various calls to secure and expedite medical care for Reilly and her family. (*Id.* ¶ 40.) During her pregnancy, Reilly and her husband asked Krasner to stop by their apartment to take her pulse. (*Id.* ¶ 49.) Dr. Krasner would occasionally walk with Reilly from her home to the office, and from the office to home. (*Id.*) While Reilly was pregnant at work, Krasner told her that if she ever needed to rest, she should use the quiet room located in the office. (*Id.* ¶ 46.)

Dr. Krasner and Reilly were social friends. He was one of six people who attended Reilly's wedding to her second husband. (*Id.* ¶ 42.) In addition to paying for the champagne at the wedding's dinner reception, Dr. Krasner transferred frequent flier miles to Reilly and her husband to cover the cost of hotel accommodations

for their honeymoon. (*Id.*) Reilly invited Dr. Krasner's wife to her baby shower, hosted at her parent's home. Both Dr. Krasner and his wife attended the shower, providing a baby car seat as a gift. (*Id.* ¶ 47–48.)

### Reilly's Pregnancy

Reilly got pregnant in early 2005. (*Id.* ¶ 44.) She experienced anxiety during her pregnancy for a variety of claimed reasons. One reason was fear of losing her job. A co-worker (a nurse practitioner) was out on maternity leave when Reilly got pregnant, and Plaintiff became anxious that Revlon was replacing her with the "temp" who was hired to fill in during her leave. (*See* Reilly Decl. ¶ 8.) Reilly suffered "extreme mental anguish" thinking that Dr. Krasner had replaced a colleague who was out on maternity leave. (P. Rule 56.1 Counterstatement ¶ 26.) In fact Krasner did replace the nurse practitioner, but that was because she decided not to return to work after the birth of her child and submitted her resignation. (Kozak Decl. Ex. L.)

Plaintiff was also anxious because Krasner was in Germany on business and did not attend, or provide a written statement for, a service award ceremony at which Revlon honored Reilly's years of service. (*Id.* ¶ 7.)

Reilly's stress manifested itself in "rapid heart palpations, higher blood pressure, excessive bouts of crying, decreased appetite, etc." (*Id.* ¶ 19.) The temporary registered nurse in the Medical Services Department explained to Reilly that during bouts of stress, Cortisol, a hormone, is released and could harm the baby. (*Id.* ¶ 20.) Reilly then asked Dr. Krasner about the effects of Cortisol and whether she should begin her FMLA leave immediately. (*Id.*) Dr. Krasner responded by stating, "You're fine—it is just first-time mother jitters." (*Id.*) He told the temporary nurse to dispense Klonopin, an anti-

psychotic drug, to combat Reilly's stress. (*Id.* ¶ 20.) The nurse refused to dispense the drug, stating that it would be harmful to the fetus. (*See* Reilly Decl. ¶ 18.) Reilly later consulted with her own treating doctor, who confirmed that the drug was contraindicated for pregnant women. (*Id.*)

Three weeks prior to the start of Reilly's leave, Revlon hired a temporary replacement to fill her position during her FMLA leave. (D. Rule 56.1 Stmt. ¶ 69.) Revlon's human resources department, Reilly, and Krasner all interviewed the temporary replacement. (*Id.* ¶¶ 66, 68.) Reilly trained and oriented the temporary employee during three weeks that their periods of employment of overlapped. (*Id.* ¶ 69.)

Reilly alleges that, during her pregnancy, Krasner made several objectionable statements to her regarding her pregnancy and imminent maternity leave. She alleges that Krasner objected to the date for her pre-scheduled caesarean section, August 29, 2005, complaining that it would interfere with his family vacation. (P. Rule 56.1 Counterstatement ¶¶ 9, 10.) When Plaintiff asked Krasner to help her train the temporary nurse practitioner who was filling in during her colleague's maternity leave, Krasner allegedly responded, "It's not my problem that you and your co-worker planned your pregnancies together." (*Id.* ¶ 14.)

### Reilly's Maternity Leave

Reilly gave birth on September 2, 2005. Pursuant to federal law and Revlon personnel policies, she began her FMLA leave of absence that same day. (D. Rule 56.1 Stmt. ¶¶ 73–74).

Revlon's employee leave policy is based on an employee's years of service with the company. (D. Rule 56.1 Stmt. ¶ 58.) The number of years that Reilly worked at Revlon entitled her to the maximum leave available under Revlon's policy—six months, inclusive of FMLA leave—with

full salary and health benefits paid during that period. (*Id.* ¶ 59.) Under FMLA, plaintiff was guaranteed the right to return to her old job if she was medically able to come back to work at or before the expiration of twelve weeks. However, employees "who return to work after an absence of more than three months [which corresponds to 12 weeks of FMLA leave] will be reinstated only if a suitable position is available, at the sole discretion of the company." (*Id.*)

An employee is responsible for requesting the "leave of absence, or any change in the status of a leave, from his/her supervisor." (*Id.*) Revlon's Human Resources Department, in conjunction with the employee's immediate supervisor, is responsible for approving an employee's written request for a leave of absence. (*Id.*) Required forms for requesting leaves of absence are available from the Human Resource Department. (*Id.*) An employee's immediate supervisor is responsible for

(i) immediately notifying the local Human Resources Department when an employee requests a leave of absence or is out ill for any period of time;

(ii) advising employees to obtain the required forms for a leave of absence from the local Human Resources Department and to submit the completed forms expeditiously

(iii) participating with the local Human Resources Department in the determination on the request for leave;

(iv) signing the Request for Personnel Action/Leave of Absence Form, in conjunction with the local Human Resources Department and Health Services Department (where appropriate);

(v) following-up with the local Human Resources Department to ensure that the employee receives an executed copy of the Request for Personnel Action/Leave of Absence Form which will notify the employee of the determination on his/her request for leave.

(*Id.*)

During an employee's absence, the employee's doctor must provide Revlon, or its disability administrator, MetLife, with medical updates supporting the employee's disabling condition. (D. Rule 56.1 Stmt. ¶¶ 60–62.)

It is not clear why Reilly gave birth on September 2, 2005, rather than on August 29, the date she was originally scheduled for a caesarean section. However, Reilly understood that she would have been allowed to begin her leave earlier had a doctor certified her as unable to work. (*Id.* ¶¶ 72, 74.)

Shortly after giving birth, Reilly was admitted to Payne Whitney Psychiatric Center, where she was diagnosed with postpartum depression on September 7, 2005. (*Id.* ¶ 75.) Payne Whitney discharged Plaintiff on September 22, 2005. (P. Rule 56.1 Stmt. ¶ 31.)

The maternity portion of Reilly's leave expired on October 17, 2005. Reilly was not medically able to return to work on that date because of her postpartum depression, so she continued her FMLA leave. (*Id.* ¶ 76.) Her twelve weeks of FMLA leave expired on November 24, 2005. (*Id.* ¶ 74.)

The parties disagree about whether Reilly performed any work during her FMLA leave. During her pregnancy, Revlon provided Reilly with a cell phone, laptop, and internet connection to use in her home. (D. Rule 56.1 Stmt. ¶¶ 93, 98.) At a meeting between Reilly, Krasner, and Mary Massimo, Revlon's President of HRD, Krasner informed Massimo that he had given Reilly a computer so she could work from home. (P. Rule 56.1 Counter-

statement ¶ 18.) Massimo responded by stating, "I didn't hear that." (*Id.* ¶ 18.)

Whatever Krasner said, it does not appear that Reilly actually did any work from home. Reilly agrees that she did not produce any work product during her FMLA leave and that Revlon did not require her to complete any work assignments during her leave. (D. Rule 56.1 Stmt. ¶ 102.) However, Reilly alleges that she responded to some calls by Krasner and her temporary replacement while she was on leave. (*Id.* ¶¶ 67, 103.) The temporary replacement called Reilly once or twice to ask, "Just where things were in the computer [and] general direction[s] on where to find certain things." (D. Rule 56.1 Stmt. ¶ 103; Reilly's Dep. Tr. 187:19–22.) Reilly does not recall how long the conversations lasted. (Reilly's Dep. Tr. 187:23–188:12.) The phone calls did not require any follow-up work on plaintiff's part. (D. Rule 56.1 Stmt. ¶ 101.) In addition, Krasner asked Reilly some work-related questions while she was being treated at Payne Whitney Psychiatric Center. (*Id.* ¶ 100.) Reilly does not recall how many work-related conversations she had with Krasner. (Reilly's Dep. Tr. 189:19–22.)

It is undisputed that Revlon continued to pay Reilly's salary and maintained her group health benefits during the entire twelve-week FMLA leave. (*Id.* ¶ 63.) It is also undisputed that Reilly would have been reinstated to her prior position at the leave's expiration had she been medically capable of working. (*Id.* ¶ 78.)

However, at the expiration of her FMLA leave on November 24, 2005, Reilly was still medically unable to return to work. (*Id.* ¶ 77.) From November 24, 2005 through February 8, 2006, Reilly took additional leave with full pay and benefits pursuant to Revlon's short-term disability policy. (Pl. MOL at 2.)

Under the law and Revlon's employment policies, Reilly had no automatic right to reinstatement once her FMLA leave expired. Revlon's Human Services Department sent Reilly a letter on December 2, 2005 confirming this:

> As previously explained under the terms of the federal Family Medical Leave Act and the [Revlon]'s leave of absence policy, your job security expires after 12 weeks of leave, or a series of leaves totaling twelve weeks . . .

> If you are released and want to return to work after the expiration of the leave with job security . . ., you will be reinstated at the sole discretion of [Revlon] . . .

> Also we remind you, if reinstated, prior to your return to work, your health care provider must verify in writing that you are medically able to perform the essential functions of a job at the Company with or without reasonable accommodation.

(*See* Kozak Affirmation Exhibit K, Letter from Myriam Ovalle to Reilly.)

*Reilly's Termination*

Dr. Gold, a psychiatrist, treated Reilly's depression during Reilly's leave. (D. Rule 56.1 Stmt. ¶ 109.) She prepared treatment notes about Reilly's care and sent them to Revlon (actually, to MetLife) to update the company about Reilly's condition. (*Id.* ¶ 110.)

Dr. Gold repeatedly certified that Reilly was unable to return to work. (*Id.* ¶ 106.) However, in her January 11, 2006 treatment notes, Dr. Gold alerted that Reilly "is beginning to think about returning to work but is clearly not ready." She opined that Reilly might be able to return to work by mid-February 2006 on a part-time basis, with the hope that she could be back full-time by mid-March of 2006. (*Id.* ¶¶ 111–113.) Met Life received this note no later

than January 24, 2006, and possibly earlier.

In a note dated January 24, 2006, Dr. Gold stated that Reilly was ready to begin re-integrating into the workforce. She recommended that Reilly "return to work in a part-time capacity on February 8, 2006. I think that she should slowly increase her work hours with the plan of returning full-time in March, 2006 if things continue to progress well." (Sarzin Decl. Ex. C.) The parties disagree about when Defendant Revlon received Dr. Gold's January 24 treatment notes. Dr. Gold states that she "personally sent" the treatment notes to MetLife via fax on January 24. (*See* Gold Decl.) However, both MetLife's records and Dr. Gold's facsimile cover sheets indicate that MetLife received the January 11 treatment notes on January 24 and didn't receive the January 24 treatment notes until February 24. (Pratt Aff. Exs. A, B.) Despite this, on February 23, 2006—after Reilly was fired—the Senior Disability Case Manager at Metlife, Darren Pratt, told Reilly that Metlife's computerized notes documented that Reilly's request to return to work on a part time basis had been supported by Dr. Gold as of January 21, 2006—which suggests that MetLife had received and was working from the January 11 notes. (*See* Reilly Decl. ¶ 34.)

In late January or early February, Reilly discussed the possibility of gradually assimilating back to work with Revlon and with Krasner. (D. Rule 56.1 Stmt. ¶ 115.) Revlon asked for a detailed schedule from Reilly's doctor explaining how her reassimilation would work. Reilly does not know whether Dr. Gold or any other health care provider provided any such documentation to Revlon prior to her termination. (*Id.* ¶¶ 119, 127; Compl. ¶ 58.) Reilly herself never prepared such a schedule for submission to Revlon. (D. Rule 56.1 Stmt. ¶ 123.) No arrangements

were made for Reilly to return to work on a part-time basis. (*Id.* ¶ 138.)

On February 8, 2006, Defendant Piacentini, then Vice President of Global Talent Management for Revlon, called Reilly and told her that her position had been filled. (P. Rule 56.1 Stmt. ¶ 47.) According to Piacentini, Revlon ended Reilly's employment because Revlon needed a full-time employee in that position. (D. Rule 56.1 Stmt. ¶ 14; Compl. ¶ 58.)

In fact, Revlon had not officially filled Reilly's position when it ended her employment. Reilly's, temporary replacement, Judith Yada, submitted an application for Reilly's position on February 9, 2006. (*See* Sarzin Decl. Ex. G.) On February 16, 2006 she accepted Revlon's offer of a full time position, to begin on February 21, 2006. (*See* Sarzin Decl. Ex. H.)

Piacentini informed Reilly that Revlon would continue to pay Reilly's regular salary pursuant to Revlon's disability policy for the balance of her six-month disability period, provided that Reilly's doctor recertified her as disabled. (D. Rule 56.1 Stmt. ¶ 146.) Reilly did not apply for long-term disability because her doctor did not consider her condition to be a long-term disability. (*Id.* ¶ 147.)

On March 20, 2006, Revlon offered Reilly a severance package, which included eight months continued pay and benefits, a non-prorated discretionary bonus, unused vacation pay and use of outplacement services, all in consideration for a separation agreement and a general release. (*Id.* ¶ 35.) Reilly declined the severance package.

On March 21, 2006, Robert Kretzman, General Counsel and Secretary for Revlon, confirmed that Reilly's position had been filled. He apologized for any miscommuni-

cation concerning her ability to return to work. (*Id.* ¶ 35.)

This lawsuit followed.

## II. DISCUSSION

### A. Summary Judgment Standard

A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In addressing a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Whether any disputed issue of fact exists is for the court to determine. *Balderman v. United States Veterans Admin.*, 870 F.2d 57, 60 (2d Cir.1989). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must present "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998).

Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Finally, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant.

### B. FMLA Claims

FMLA gives eligible employees an "entitlement" to twelve work weeks of unpaid leave per year. 29 U.S.C. § 2612(a)(1). While an employee is on FMLA leave it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the FMLA. 29 U.S.C. § 2615(a)(1).

FMLA leave is triggered by, *inter alia,* "the birth of a son or daughter and in order to care for such son or daughter" and "a serious health condition that makes the employee unable to perform functions of his or her position." 29 U.S.C. §§ 2612(a)(1)(A), (D).

At the end of a FMLA leave, the employee has the right to be restored to the position, or its equivalent, that he or she held prior to taking leave. 29 U.S.C. § 2614(a)(1). The right to reinstatement is not, however, absolute, "If the employee is unable to perform an essential function of the position because of a physical or mental condition, including the continuation of a serious health condition, the employee has no right to restoration to another position under FMLA." 29 C.F.R. § 825.214(b); *see Sarno v. Douglas Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155, 161–62 (2d Cir.1999). And once the twelve weeks of guaranteed leave are exhausted, if the employee does not return to work—for whatever reason—the employer can replace the employee, as long as the employer is not doing so to punish the employee for exercising her FMLA rights.

■ FMLA expressly creates a private right of action for equitable relief and money damages against any employer for section 2615 violations. 29 U.S.C. § 2617(a)(2); *see Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 123 S.Ct. 1972, 155 L.Ed.2d 953 (2003).

Plaintiff Reilly alleges two causes of action under the FMLA: (i) interference with FMLA rights and (ii) retaliation for exercising her FMLA rights. (*See* compl. ¶¶ 83–90.) Neither has merit.

### i. FMLA Interference Claims

■ To establish an interference claim pursuant to 29 U.S.C. § 2615(a)(1), a plaintiff need only prove that an "employer in some manner impeded the employee's exercise of his or her right[s]" protected provided by the FMLA. *Sista v. CDC Ixis North America, Inc.*, 445 F.3d 161, 176 (2d Cir.2006) (citing *King v. Preferred Technical Group*, 166 F.3d 887, 891 (7th Cir. 1999)). To establish a *prima facie* claim of interference with rights under the FMLA, a plaintiff must establish by a preponderance of the evidence that: "(1) she is an eligible employee under the FMLA; (2) defendants constitute an employer under the FMLA; (3) she was entitled to leave under the FMLA; (4) that she gave notice to defendants of her intention to take leave; and (5) defendants denied her benefits to which she was entitled by the FMLA." *Esser v. Rainbow Advertising Sales Corp.*, 448 F.Supp.2d 574, 580 (S.D.N.Y.2006) (collecting cases).

At first blush, it does not appear that Revlon interfered with Plaintiff's rights under FMLA. Reilly admits that she took her entire twelve weeks of FMLA leave, and that Revlon provided salary and health benefits during the twelve-week period, (D. Rule 56.1 Stmt. ¶ 63). She also admits that Revlon was willing to reinstate her to her previous position at the expiration of her FMLA leave and would have

done so had plaintiff been medically capable of coming back to work. (*Id.* ¶ 78.) It follows that Reilly did not lose any benefit and was not denied any right—twelve weeks leave and a guarantee of reinstatement at the end of the twelve weeks— under FMLA.

Plaintiff nonetheless contends that her FMLA leave was interfered with in two distinct ways.

■ First, Plaintiff contends that Krasner's remarks and behavior during her pregnancy caused her to fear retaliation and, therefore, to delay starting her FMLA leave until the birth.

Regulations promulgated under FMLA provide, "Interfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." 29 C.F.R. § 825.220(b) (internal quotes omitted). Interpreting "discouraging" within the meaning of the regulation, Plaintiff cites *Shtab v. Greate Bay Hotel and Casino, Inc.*, 173 F.Supp.2d 255 (D.N.J.2001), for the proposition that employer actions that cause an employee to delay the assertion of FMLA rights is actionable as an FMLA interference claim.

■ However, courts in the Second Circuit require a Plaintiff who asserts a FMLA interference claim on a "discouragement theory" to offer evidence that she tried to assert her FMLA rights and was thereafter discouraged from taking FMLA leave, unless the employer's purported acts of discouragement would have dissuaded a similarly situated employee of ordinary resolve from attempting to exercise his or her FMLA rights. *See Golden v. New York City Dept. of Environmental Protection*, 2007 WL 4258241 (S.D.N.Y. Dec. 03, 2007). Although the plaintiff need not have given formal notice that she would be tak-

ing leave, a plaintiff must objectively assert his or her FMLA rights before she can prevail on an "interference by discouragement" theory. *See Avila–Blum v. Casa de Cambio Delgado, Inc.*, 519 F.Supp.2d 423, 429 (S.D.N.Y.2007).

The plaintiff in *Golden* suffered from a chronic medical condition. He alleged that demeaning comments about his condition made by his supervisor discouraged him from asserting his FMLA rights, because he believed his supervisor would deny any requests for leave. *Id.* at \*2–3. However, the plaintiff did not request leave for the dates at issue, and the court granted defendant's motion for summary judgment. It held, *inter alia*, that the comments made by plaintiff's supervisor did not interfere with the plaintiff's FMLA rights because the plaintiff did not demonstrate that his supervisor's comments "would have deterred an employee of ordinary firmness, in a situation similar to his, from requesting or taking FMLA leave." The court further ruled that plaintiff's request for leave could have been submitted to someone other than the supervisor who made the demeaning comments. *Id.* at \*3.

Plaintiff first submitted to Revlon's Human Resources Department a formal request for a medical leave of absence, signed by both her and Dr. Krasner, on August 16, 2005. (Kozak Decl. Ex. I.) On the form, the requested start date is September 2, 2005, which is the date that Reilly actually started her leave. (*Id.*) There is no evidence in the record about the date when plaintiff had her "Cortisol" conversation with Dr. Krasner, and there is no evidence that plaintiff formally tried to exercise her FMLA rights prior to that conversation. Furthermore, nothing about that conversation would have deterred an employee of ordinary firmness from going on leave if it were medically indicated. Reilly asked Krasner to opine, as a physician, whether she should start her leave

early. Krasner said no. Nothing in the record suggests that his real medical opinion was otherwise; there is no evidence whatsoever that plaintiff's obstetrician, or any other medical professional, advised plaintiff to start her leave early, or thought that pre-partum leave was medically indicated.

Plaintiff also alleges that Krasner objected when she told him (on July 20) that her obstetrician had scheduled an elective caesarean section on August 29. (Reilly Decl. ¶ 12–13.) One could infer that Reilly changed the date of her elective caesarean in response to her boss' comment, and I do so infer for purposes of this motion. However, moving the date for a non-emergent caesarian section is not the same thing as being discouraged from taking FMLA leave. There is no evidence that anyone at Revlon told plaintiff she should not take her FMLA leave; in fact, Reilly spoke with Revlon's Human Resources Department and received written communications advising her of her rights and responsibilities under Revlon's FMLA leave policies. (*See* D. Rule 56.1 Stmt. ¶¶ 71.) Reilly understood that Revlon would have allowed her to begin her leave earlier had a doctor certified that she was unable to work. (*See* D. Rule 56.1 Stmt. ¶¶ 72, 74). Krasner's complaint about the inconvenient date for her caesarian section is not something that would have deterred an employee of ordinary firmness, in a similar situation from asserting his or her FMLA rights, *See Golden*, 2007 WL 4258241 at \*3—especially not an employee who had a long-standing and close personal friendship with her boss. While it is significant that Reilly needed Krasner to sign her request for leave form submitted to HR for approval, that fact alone does not bar summary judgment for defendant.

Second, Plaintiff alleges that Revlon interfered with her leave by forcing her to

work from home during the leave period when Krasner and her temporary replacement either called or personally visited her at Payne Whitney. Plaintiff argues that this interference is bolstered by the fact that Revlon provided her with a cell phone, computer, and an internet-connection in her home.

But plaintiff's few documented work-related communications with Revlon employees during her leave do not rise to the level of FMLA interference as a matter of law.

██ Fielding occasional calls about one's job while on leave is a professional courtesy that does not abrogate or interfere with the exercise of an employee's FMLA rights. When limited to the scope of passing on institutional knowledge to new staff, or providing closure on completed assignments, employers do not violate the FMLA by making such calls. *See Kesler v. Barris, Sott, Denn & Driker, PLLC,* 482 F.Supp.2d 886, 910–11 (E.D.Mich.2007).

Nothing in the record suggests that calls to plaintiff were anything other than the types of calls that were deemed appropriate in *Kesler.* Reilly testified that temporary replacement called once or twice to ask, "Just where things were in the computer [and] general direction[s] on where to find certain things." (D. Rule 56.1 Stmt. ¶¶ 67, 103; Reilly's Dep. Tr. 187:19–22.) Reilly does not recall how long the conversations lasted and admits that the phone calls did not require any follow-up work on her part. (D. Rule 56.1 Stmt. ¶ 101; Reilly's Dep. Tr. 187:23–188:12,) Reilly states that Krasner asked her some work-related questions on the telephone and while she was being treated at Payne Whitney Psychiatric Center. (D. Rule 56.1 Stmt. ¶ 100.) Reilly does not recall how many work-related conversations she had with Krasner; she offered no evidence

that they were frequent or of long duration. (Reilly's Dep. Tr. 189:19–22.)

As for the rest: Reilly admits that she did not produce any work product while she was out on FMLA leave, and that Revlon did not require her to complete any assignments during her leave. (D. Rule 56.1 Stmt. ¶ 102.) She did not go to the office or assume any of her normal duties during her twelve-week FMLA leave. She never used the computer she had at home to produce any work. (Reilly Dep. Tr. 190:6–192:5.)

Because Reilly admits that she was not required to perform any work, and did not perform any work during her leave, and that the calls she received were both infrequent and brief in duration, she has not raised any genuine issue of fact supporting her "forced to work from home" claim. It, too, is dismissed.

### ii. *FMLA Retaliation Claims*

FMLA prohibits employers from punishing employees in retaliation for exercising their FMLA rights. Employees have a private right of action against employers who punish them for exercising a FMLA right.

██ FMLA retaliation claims include an intent element and are analyzed pursuant to the three-step burden-shifting established by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973): *see Potenza v. City of New York,* 365 F.3d 165, 168 (2d Cir.2004).

██ To establish a *prima facie* retaliation claim under the FMLA a plaintiff must show that: (1) she exercised rights protected under the FMLA; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference

of retaliatory intent. *Potenza v. City of New York,* 365 F.3d 165, 168 (2d Cir.2004).

Temporal proximity between a plaintiff's exercise of rights created by FMLA and adverse employment action can give rise to an inference of retaliation. While being fired during FMLA leave is certainly enough to create *a prima facie* inference of retaliation for exercising a FMLA right, *see Martin v. Brevard County Public Schools,* 543 F.3d 1261, 1268 (11th Cir.2008), a three-month gap between the expiration of an employee's FMLA leave and termination is likely to be insufficient to give rise to an inference of retaliation, *see O'Reilly v. Consol. Edison Co. of New York, Inc.,* 374 F.Supp.2d 278 (E.D.N.Y.2005), *aff'd,* 173 Fed.Appx. 20 (2d Cir.2006).

In *O'Reilly,* the defendant company's leave policy provided plaintiff with 32 weeks of disability leave in addition to her FMLA leave. The plaintiff, O'Reilly, was fired after three months of post-FMLA leave. She was fired after her employer discovered that she had misrepresented her condition in order to remain on leave.

The court concluded that the temporal proximity between the end of plaintiff's FMLA leave and termination was too great to admit an inference of retaliation for the exercise of FMLA rights. *Id.*

Revlon granted Reilly twelve weeks of FMLA leave. Reilly admits that she would have been reinstated to her prior position at the leave's expiration if she were medically capable. (D. Rule 56.1 Stmt. ¶ 78.) Revlon did not fire plaintiff until February 8, 2007—two and one half months after her FMLA leave expired. (P. Rule 56.1 Stmt. ¶ 146.) As was true in *O'Reilly,* the passage of so much time between the expiration of Reilly's FMLA leave and the termination of her employment does not admit of an inference of retaliation for exercising her FMLA rights—especially since Revlon could have

taken steps to fill Reilly's position as early as November 29 and still been within the law.

Plaintiff argues that a retaliatory inference can be drawn because she was terminated while she was on sick leave for the same medical condition that caused her to continue her FMLA leave. If plaintiff's argument were accepted by courts, judges would effectively amend FMLA to expand plaintiff's right to reinstatement beyond the twelve weeks provided by Congress, since it would always be possible to infer a retaliatory motive if an employee's condition persisted beyond twelve weeks.

Reilly also argues that she was terminated only after Revlon received Dr. Gold's treatment notes, which indicated that plaintiff would be able to return to work in mid-February. For purposes of this motion, the court accepts plaintiff's allegation that Revlon had notice, as of January 24, 2006, that Reilly would be medically able to return to work on a part time basis on February 8. There is temporal proximity between the receipt of the treatment notes and the adverse action, but that does not mean plaintiff lost her job as punishment for having taken FMLA leave.

Plaintiff admits that Revlon would have reinstated her at the end of her FMLA leave had she been medically capable of working. (D. Rule 56.1 Stmt. ¶ 78.) Given that admission, it is not possible for a rational trier of fact to find that she was fired two and one half months later because she had previously exercised her FMLA leave. Reilly might well have been fired because Revlon—having kept the job open for several months beyond the legally-required twelve weeks—was not prepared to deal with a part-time arrangement, even on a temporary basis. As will be seen below, that may add up to disabili-

ty discrimination. But it is not FMLA retaliation.

Because Plaintiff has not made out *a prima facie* case of FMLA retaliation, Defendants' motion for summary judgment dismissing Plaintiff's FMLA claims is granted.

## C. Americans with Disabilities Act

■ To sustain a claim for discrimination under the Americans with Disabilities Act ("ADA"), a plaintiff must establish a *prima facie* case, by showing that "plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of [the] disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer refused to make such accommodations." *Rodal v. Anesthesia Group of Onondaga, P.C.,* 369 F.3d 113, 118 (2d Cir.2004). If plaintiff. establishes a *prima facie* case, the burden of production shifts to defendant to articulate a legitimate non-discriminatory reason for its challenged actions. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

Reilly also claims disability discrimination based on her depression under section 296.1(a) of the New York State Human Rights Law, *see* N.Y. Exec. Law §§ 296.1(a), and under the New York City Human Rights Law, N.Y.C.Admin.Code § 8–107. Her inclusion of claims under these statutes broadens the definition of "disability" in key ways.

i. *Whether Plaintiff has an ADA disability*

■ The parties dispute whether postpartum depression is a disability within the meaning of the ADA. The ADA defines a "disability" as (A) "a physical or mental impairment that substantially limits one or more of the major life activities of such individual"; (B) "a record of such impairment"; or, (C) "being regarded as having such an impairment." 42 U.S.C. §§ 12102(1)(A)-(C). Whether an individual is disabled under the ADA is determined on a case-by-case basis. *Reeves v. Johnson Controls World Servs., Inc.,* 140 F.3d 144, 151 (2d Cir.1998).

■ The Supreme Court has prescribed a three-step process for determining whether an individual is disabled under subsection (A). *See Bragdon v. Abbott,* 524 U.S. 624, 631, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998). First, a court must determine whether the plaintiff suffers from a physical or mental impairment. *See Colwell v. Suffolk County Police Dep't.,* 158 F.3d 635, 641 (2d Cir.1998). Second, the court must identify the life activity upon which the plaintiff relies and determine whether it constitutes a major life activity under the ADA. *Bragdon,* 524 U.S. at 631, 118 S.Ct. 2196. Third, the court determines whether the identified impairment substantially limited that life activity. *Bragdon,* 524 U.S. at 631, 118 S.Ct. 2196.

■ Depression can fall within the meaning of a physical or mental impairment, 29 C.F.R. § 1630.2(h)(1) ("physical or mental impairment means any mental disorder ... such as ... emotional or mental illness"), provided that the condition is not a "temporary psychological impairment." *Oblas v. Am. Home Assur. Co.,* 199 F.3d 1323, 1999 WL 759026, at *2 (2d Cir. Sept. 24, 1999). The aggregate of Reilly's two-week hospitalization, Dr. Gold's statement that Reilly was unable to return to work for five months, and Reilly's sworn testimony that she suffered significant limitations in her ability to sleep, eat, think and concentrate, taken, collectively create an issue of fact as to whether her postpartum depression rises to the level of an emotional or mental illness

within the meaning of *Bragdon*'s first step. Reilly's postpartum depression allegedly lasted from at least September 7, 2005, when she was diagnosed and hospitalized, and until February 8, 2006, the date that Dr. Gold stated Reilly could return to work on a part-time basis. A five-month mental impairment that interferes with major life activities is not precluded as a matter of law from being deemed a disability; at the very least, it raises a disputed question for the jury.

In order to qualify as a disability within the meaning of the ADA, plaintiff must identify "major life activities" that are "impaired" by her condition. "Major life activities" are defined as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). This list is illustrative and not exhaustive. *See Colwell*, 158 F.3d at 642 (identifying additional major life activities to include sleep). Reilly identified an impaired ability to eat, sleep, and work.

At *Bragdon*'s third step, the court determines whether the Plaintiff's impairment "substantially limits" the life activities that are properly deemed major. *Colwell*, 158 F.3d at 643. EEOC regulations implementing the ADA define "substantially limited" to mean:

> (i) Unable to perform a major life activity that the average person can perform, or (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1). The regulations provide three factors to guide the determination of whether an individual is substantially impaired in a major life activity: "(i)

[t]he nature and severity of the impairment; (ii)[t]he duration or expected duration of impairment; and (iii)[t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. §§ 1630.2(j)(2).

▮ Reilly has submitted evidence that she was unable to work—something the average person can do. Dr. Gold's January 11, 2006 treatment notes state that Reilly is "clearly not ready" to return to work. (D. Rule 56.1 Stmt. ¶ 111.) The doctor recommended that plaintiff gradually reassimilate herself into the workplace. Although Dr. Gold's treatment notes are not couched in the ADA's language, a treating physician's diagnosis that a ADA-claimant is "clearly not ready" to return to work because of depression and that she requires some accommodation in order to get back to work creates a material question of fact about whether the claimant is substantially limited in the major life activity of working.

Reilly has not, however, demonstrated that her ability to sleep is substantially impaired. Noting that difficulty sleeping is extremely widespread, the court in *Colwell* held that an ADA-claimant failed to show a substantial limitation in sleeping when the claimant "made no showing that his affliction is any worse than is suffered by a large portion of the nation's adult population." 158 F.3d at 644. The only evidence in this case of limited sleep are comments in Dr. Gold's treatment notes, over several visits, that Reilly "reports poor sleep," has decreasing sleep, or continues to have "difficulty w[ith] sleep." (*See* Sarzin Decl. Ex. C.) This does not demonstrate a substantial limitation on the major life activity of sleeping that is worse than is suffered by the general population—especially the population of mothers

of newborns, many of whom get very little sleep for months.

Nor has Reilly shown that her ability to eat substantially limits her ability to care for herself. Dr. Gold's treatment notes, over several visits, state that Reilly "reports poor ... appetite," has a decreasing appetite, or has difficulty with her appetite. (*See* Sarzin Decl. Ex. C.) By January 11, Dr. Gold noted that Reilly's appetite and sleep had improved. (*Id.*) A poor appetite over a period of several months, without more, does not rise to the level of a substantial limitation in caring for oneself compared to the manner in which an average person in the general population can care for him or herself. *See* 29 C.F.R. § 1620.2(j)(1).

But plaintiff has clearly raised genuine issues of fact concerning whether she had an ADA disability so as to preclude the entry of summary judgment.

■■■■ The New York State Executive Law and the New York City Administrative Code have a broader definition of "disability" than does the ADA; neither statute requires any showing that the disability substantially limits a major life activity. *See Giordano v. City of New York,* 274 F.3d 740, 753 (2d Cir.2001). Thus, the discussion of whether sleeping and small appetite constitute major life activities is of no relevance to the viability of those claims. As defendants concede, both the State and the City recognize depression as a "disability." Therefore, Reilly has satisfied the first test for getting to trial on her non-federal disability claims as well.

The foregoing discussion establishes that Reilly has raised genuine issues of fact concerning her status as a person with an actual disability. Plaintiff also argues that she was perceived as having a disability and was discriminated against on that basis.

■■■■ The ADA and similar statutes prohibit discrimination against an individual who, while not actually suffering from a disability, is perceived by the employer as having a disability that will (in the case of the ADA) prevent the employee from performing the duties of her position. *Okoro v. Marriott Intern., Inc.,* 2008 WL 4449386, at \*9 (Sept. 29, 2008 S.D.N.Y.) (applying this standard to New York State and New York City law). A finding of perceived, or "regarded as having," disability depends "on the employer's perception of the employee," *Colwell v. Suffolk County Police Dep't,* 158 F.3d 635, 646 (2d Cir.1998). A person who does not show that she actually suffers from an impairment that substantially limits a major life activity can nonetheless be perceived as disabled. *See Reeves v. Johnson Controls World Services Inc.,* 140 F.3d 144, 153 (2d Cir.1998). For ADA purposes, however, it is not enough that the employer regards the employee as somehow disabled. *Colwell,* 158 F.3d at 646. Rather, the employer must only regard the employee as disabled within the meaning of the ADA, "as having an impairment that substantially limit[s] a major life activity." *Colwell,* 158 F.3d at 646; 42 U.S.C. § 12102(1)(C).

■■■■ Even if Reilly did not suffer from an ADA-recognized disability, Dr. Krasner "did not believe" that Reilly could resume her position. The ADA does not require that Reilly actually have a disability, as long as defendants "regarded" Reilly as having a disability. A genuine issue of material fact exists whether or not Dr. Krasner considered Reilly as having an impairment that limited her ability to work or freely go about other major life activities.

ii. *Notice of Disability*

The second prong of a *prima facie* case—that the employer had notice of the

disability—is not disputed. Revlon approved Reilly's leave for postpartum depression and received periodic updates regarding her condition from Dr. Gold.

### iii. *Qualification to perform the essential functions of plaintiff's position*

The parties dispute whether Reilly was qualified to perform the essential functions of her position with or without reasonable accommodation when she sought to come back to work.

The ADA protects a "qualified individual with a disability from discrimination." 42 U.S.C. § 12112(a). A qualified individual with a disability is "an individual with a disability who, with or without, reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "Essential functions are defined under EEOC regulations to mean the fundamental duties to be performed in the position in question, but not functions that are merely marginal." *Shannon v. New York City Transit Authority*, 332 F.3d 95, 100 (2d Cir.2003) (quoting *Stone v. City of Mount Vernon*, 118 F.3d 92, 97 (2d Cir.1997)) (internal quotes omitted).

The parties' agree that whether Reilly was able to work must be ascertained as of the date of her termination, February 8, 2006. There is no dispute that Reilly possessed the requisite skill, experience and education needed to fill the position she had occupied for many years. The issue here is whether she would have been physically and mentally able to perform the essential functions of her position if she were accommodated with part-time work for a short period. This conflates with the question of whether part-time work, on a temporary basis, is a reasonable accommodation.

### iv. *Whether Revlon refused to make reasonable accommodations*

In order to protest the failure to make a reasonable accommodation, the employee must show that she asked for an accommodation. Reilly discussed returning on a part-time basis with both Revlon and Krasner in the weeks before her termination, and viewing the evidence most favorably to plaintiff, there was medical documentation that she was capable of returning to work on this basis. This means that her employer was aware that Reilly sought the accommodation of being allowed to ease back into a full-time schedule. There is no legal requirement that Reilly have put her request in any particular form. It is clear enough that, before firing Reilly, Revlon knew she wanted to come back to work on a part-time basis for a few weeks.

▇▇▇ Modified work schedules may constitute a reasonable accommodation in certain circumstances. *See* 42 U.S.C. § 12111(9)(B). A scheduling accommodation, however, is not reasonable when it requires an employer to eliminate an essential function of a job. *See Rodal*, 369 F.3d at 121. "A court must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position." *Id.* (quoting *D'Amico v. City of New York*, 132 F.3d 145, 151 (2d Cir.1998)) (internal quotes omitted). But ultimately, the question whether a task constitutes an essential function depends on the totality of the circumstances. *See Mount Vernon*, 118 F.3d at 97.

Revlon does not provide the court with any information about which essential job functions could not be fulfilled if plaintiff were to be accommodated with a short-term part-time schedule. Rather, it argues that Reilly's request for part-time work was unreasonable as a matter of law,

because it was really a request for permission to take open-ended leave. *See Stamey v. NYP Holdings, Inc.*, 358 F.Supp.2d 317, 324 (S.D.N.Y.2005) (citing *Mitchell v. Washingtonville Cent. School Dist.*, 190 F.3d 1, 9 (2d Cir.1999)).

But Reilly did not ask her employer for indefinite leave—or even for permission to work part-time on an indefinite basis. Dr. Gold's treatment notes indicated that plaintiff was prepared to begin working part time on February 8 (or at least by mid-February) and state that her hours could be gradually increased so that she would be working full time just a few weeks later. Revlon does not argue that a part-time schedule with a view to full-time assimilation in a month is objectively unreasonable in and of itself. Nor does Revlon offer any evidence that such a schedule would prevent Reilly from performing the essential functions of her job—it merely asserts, in conclusory fashion, that the position requires a full-time worker.

 Viewing the evidence most favorably to plaintiff, it would appear that Reilly has at least raised a genuine issue of fact concerning the reasonableness of the short-term accommodation she actually sought.

Revlon argues that it provided sufficient accommodation to plaintiff's disability by permitting Reilly to take her 12–week FMLA leave and the giving her ten additional weeks of paid disability leave for her depression. Providing legally-required FMLA leave is not any sort of accommodation; it is a requirement of law. Providing paid disability leave above and beyond the FMLA requirements is commendable, but providing benefits to a person who cannot work is not the same thing as making an accommodation in the workplace so the person can work. The relevant question in this case is whether a part-time schedule for a few weeks would have been a reasonable accommodation to Reilly's disability on the date of her termination.

 Of course, even if an accommodation were reasonable, employers are entitled to summary judgment if they establish an undue hardship affirmative defense. *See Rodal,* 369 F.3d at 121. To sustain the defense a defendant must make a detailed showing that the proposed accommodation would require significant difficulty or expense in light of specific statutory factors. *Id.* at 121–22; *see* 42 U.S.C. § 12111(10). Revlon does not assert this defense in its moving papers, and offers no evidence to support it; therefore, it is deemed established that Revlon would not have suffered any undue hardship by granting plaintiff's request.

The question of the reasonableness of the accommodation plaintiff sought must be taken to trial.

Revlon declined to grant Reilly's request that she be allowed to reassimilate back into the workplace, and instead fired her. Regrettably, Revlon's motion papers do not discuss any legitimate, non-discriminatory reason why defendant reached this decision—Revlon made the decision to rest its entire argument in favor of summary judgment on the plaintiff's failure to make out a prima facie case. Since plaintiff HAS made out a prima facie case, the defendant's motion for summary judgment dismissing the disability discrimination claims must be denied.

The court assumes that Revlon's reason for terminating plaintiff's employment was (as expressed by Dr. Krasner), a belief that Reilly could no longer do her job on a full-time basis, and a need for a full-time worker to fulfill all the essential elements of the position. Since, as discussed above, there is a genuine issue of fact in that regard, Reilly's claims of disability discrimination under the various statutes will proceed to trial.

## D. Pregnancy Discrimination Act

The Pregnancy Discrimination Act ("PDA") amends Title VII of the Civil Rights Act to provide that discrimination "on the basis of sex" includes discrimination "on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. 2000e(k). The act further provides that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes ... as other persons not so affected but similar in their ability or inability to work." 42 U.S.C.2000e(k).

Regulations promulgated by the Equal Employment Opportunity Commission further provide that, "Disabilities caused or contributed to by pregnancy, childbirth, or related medical conditions, for all job-related purposes, shall be treated the same as disabilities caused or contributed to by other medical conditions, under any health or disabilities insurance or sick leave plan available in connection with employment." 29 C.F.R. § 1604.10(b). This obligates employers to, *inter alia*, apply the commencement and duration of leave, the availability of extensions, and reinstatement after leave on the same terms as applied to other disabilities. *See* 29 C.F.R. § 1604.10(b).

▮ Summary judgment for Title VII cases is determined pursuant to *McDonnell's* three-part burden shifting analysis. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). To establish a *prima facie* case, the plaintiff must show that "(I) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." *Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 (2d Cir.2000); *Infante v. Ambac Fin. Group,* 2006 WL 44172, *4 (S.D.N.Y. Jan. 5, 2006) (applying *Weinstock's prima facie* case standard to

the PDA), *aff'd,* 257 Fed.Appx. 432 (2d Cir.2007).

Reilly asserts her PDA claim only against Revlon. (Compl. ¶¶ 80–82.) She alleges that Revlon fired her because of her pregnancy and the delivery of her child. (*Id.*) She claims that discrimination is evident because of Krasner's negative comments towards Reilly prior to beginning her leave. Reilly also claims an additional PDA violation on the basis that Krasner's negative comments unlawfully pressured her into delaying her leave until the day before she gave birth. (Pl. Br. at 22.)

▮ Reilly is a member of the class protected by the PDA. This District has held that the statute's scope protecting "women effected by pregnancy, childbirth, or related medical conditions," 42 U.S.C. § 2000e(k), includes conditions related to pregnancy that occur after the actual pregnancy. *Infante,* 2006 WL 44172 at *4 (citing *Kocak v. Cmty. Health Partners of Ohio, Inc.,* 400 F.3d 466 (6th Cir.2005)). Postpartum depression is a condition related to pregnancy and accordingly falls within the PDA's protections. *See id.* The second and third prongs of a *prima facie* PDA discrimination claim are satisfied for the same reasons that the analogous requirements to establish a *prima facie* claim under the ADA are satisfied: Reilly has submitted evidence creating a question of fact as to whether she is qualified for her position on a part-time basis as of February 8; Revlon has not argued that a part-time schedule by itself renders Reilly unqualified; and, Reilly's termination constitutes adverse employment action.

▮ However, Reilly fails to offer any evidence tending to suggest that she was fired in circumstances suggestive of pregnancy discrimination.

Dr. Krasner's purported negative comments prior to the birth of her child do not form the basis of a PDA claim. Reilly has effectively admitted that these comments played no role in her termination, because she admits that Revlon would have reinstated her at the end of her FMLA leave had she been medically capable of returning to work. Further the stray comments made by Krasner during Reilly's pregnancy, while objectionable, are too innocuous and temporally removed from Reilly's termination to infer that they were causally connected to the decision to fire her six months later. The comments were made well before Revlon continually extended Reilly's leave with full pay and medical benefits in order to accommodate her disability.

■ Moreover, the PDA only requires that women affected by pregnancy or related medical conditions be treated the same as other persons not so affected but similar in their ability or inability to work. *See* 42 U.S.C.2000e(k). Plaintiff does not offer any evidence that she was treated differently from male or non-pregnant female employees who suffered from depression unrelated to pregnancy for extended periods. Absent such evidence, the circumstances of her termination do not give rise to any inference of pregnancy discrimination. The PDA claim is therefore dismissed.

Reilly also sues for pregnancy discrimination under the City Human Rights Law, which (like Title VII) bars an employer from treating pregnancy differently from any other medical condition. Identical standards apply to plaintiff's pregnancy discrimination claims under Title VII and the Administrative Code of the City of New York. *See Weinstock,* 224 F.3d at 42 n. 1. Plaintiff's failure to offer any evidence that her pregnancy-related depression was treated any differently than the depression of any other employee renders her claim equally deficient under City and federal law.

**E. Individual Defendants**

■ Plaintiff contends that individual Defendants Krasner and Piacentini are liable under New York Human Rights Law, which provides that "It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the forbidden acts under this article, or to attempt to do so." N.Y. Exec. § 296(6). The individual Defendants' motion for summary judgment is denied for Reilly's surviving claims of disability discrimination.

**F. Punitive Damages and Back or Front Pay**

■ Plaintiff claims punitive damages for Revlon's conduct. Punitive damages are available in cases of intentional discrimination where the employer acted with "malice or with reckless indifference" to the disabled individual's federally-protected rights. *See* 42 U.S.C. § 1981a; *see Kolstad v. American Dental Ass'n,* 527 U.S. 526, 536, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999). I will decide whether to charge punitive damages after I hear the evidence at trial.

Defendant Revlon contends that any claims for lost wages must be deemed cut off as of December 15, 2006 when Revlon underwent corporate downsizing and eliminated the entire Medical Services Department, including Reilly's position. *See Meschino v. Int'l Tel. & Tel. Corp.,* 661 F.Supp. 254, 257–58 (S.D.N.Y.1987). Whether Reilly's position was eliminated in December of 2006 is a disputed issue and will be decided at trial.

**III. CONCLUSION**

For the foregoing reasons summary is granted to Defendants on Plaintiff's

FMLA PDA, and NYCHRL pregnancy discrimination claims. Defendant Revlon is denied summary judgment on Plaintiff's ADA and analogous state and city law claims.